Holliday Bros. vs. Cohen.

| 34 | 707 |
|----|-----|
| 55 | 333 |
| 55 | 624 |
| 34 | 707 |
| 57 | 207 |
| 34 | 707 |
| 68 | 171 |
| 34 | 707 |
| e70 | 602 |
| 34 | - 707 |
| f85 | 607 |

## HOLLIDAY BROS. VS. COHEN.

1. ATTACHMENT: *Removing effects out of the state.*
   If a debtor is removing his property out of the state, not leaving sufficient to pay all his debts, a creditor may attach, although sufficient be left to pay his debt; and testimony of other debts is admissible to prove the insufficiency of the property to pay all.

2. SAME: *Damages for.*
   Damages for injury to credit and loss of prospective profits in business, are not recoverable in an action on the attachment bond, nor in the attachment suit. If recoverable at all, it must be in a separate action on the case.

3. WITNESS: *Evidence of bad character of, whether too remote.*
   It is within the discretion of the circuit judge to admit or refuse evidence of the character of a witness for truth in a neighborhood in which he had previously lived, according as he may think it too remote, or fairly proper to assist the jury in judging of the witness' present veracity.

4. ATTACHMENT: *Act of November 10, 1875, construed, etc.*
   For construction of the act of November 10, 1875, amending the attachment laws, and the proper practice under it, see opinion. (REP.)

Holliday Bros. vs. Cohen.

APPEAL from *Chicot* Circuit Court.
Hon. T. F. SORRELLS, Circuit Judge.
*Reynolds*, for appellants.
*Dodge & Johnson, Rose, contra.*

EAKIN, J.    Appellants sued Cohen upon a bill of exchange, drawn by him, in their favor, upon Richardson & May, of New Orleans, for $1,000, dated at Laconia, Arkansas, January 1, 1876, payable twenty days thereafter.    Acceptance was refused, and the same was presented again for payment at maturity; which was refused, also—the said drawees answering, as the complaint says, "that they had no funds of defendant with which to pay the same."    There is no more direct allegation that there were no funds; nor any allegation of notice to defendants.    With the complaint, they filed an affidavit for an attachment, verifying the debt, and stating that defendant "is about to remove his property, or a material part thereof, out of this state, not leaving enough therein to satisfy the plaintiffs, or the claim of said defendant's creditors; and that, unless an attachment is issued, there is reason to believe that plaintiffs' claim will be lost, or greatly delayed."    This affidavit was made by George Burns, as their agent.    The ordinary bond was given by two sureties.

An attachment issued, and, on the thirteenth of April, 1876, was levied on a store house and goods of defendant, which were left in possession of defendant's clerk, untouched; with directions not to sell the same, but to proceed as usual with the other duties of his business.   On the fifteenth it was levied on ten bales of cotton; and on the seventeenth, the store-house and goods were released.   On the nineteenth, the ten bales of cotton were duly appraised, and the defendant gave a bond for the performance of the

judgment of the court, or to produce the cotton or its value.

On the thirteenth of July, 1876, after a motion to discharge the attachment had been overruled, the defendant filed an affidavit, denying the truth of the statement in plaintiffs' affidavit, to the effect that the defendant was about to remove his property, or a material part thereof, out of this state, not leaving enough therein to satisfy the plaintiffs, or the claims of said defendant's creditors;" and that, "unless an attachment was issued, there was reason to believe that plaintiffs' debt would be lost, or greatly delayed."

At the July term, 1877, a jury was impanneled to try this issue, which returned this verdict: "We, the jury, find for the defendant, and assess his damages at $4,000." Whereupon, judgment for that amount was rendered in favor of defendant, against the plaintiffs and their sureties, for the damages sustained by the defendant, by reason of the wrongfully suing out said attachment, and for costs, "and that he have execution for the same." A motion for a new trial was overruled, bill of exceptions taken, and appeal.

It appears, from the bill of exceptions, that the circuit judge acted, in receiving and excluding testimony, upon the view that it was not competent for the plaintiffs to show what debts the defendant owed others; and that he was removing his property so as not to leave sufficient to pay his creditors; but the judge held, and so instructed the jury, that, "in order to sustain the affidavit, the plaintiffs should prove that the defendant was about to remove his property, or a material part thereof, from the state, not leaving sufficient to satisfy plaintiffs' demand; otherwise, to find for the defendant, and assess his damages at whatever amount the proof shows he sustained." This was excepted to by plaintiffs, and was all the instruction given.

The affidavit was, substantially, in the terms of the sixth ground of attachment, set forth in the first clause of *sec. 388, Gantt's Digest.* We can see no meaning in the concluding expression of the sixth ground, to-wit: "or the claim of said defendant's creditors," unless the legislature meant to allow an attachment in favor of one creditor, whenever a debtor might be about to remove his property to such an extent as not to leave enough to satisfy all his creditors. Justice requires this. It would be but a tantalizing remedy if each creditor of many, should be obliged to stand by and see the common debtor spirit away his effects until he had reduced the remainder within the value of the largest debt. And it would be, then, very hard upon the minor creditors, if the largest could sue out his attachment, and claim a preference over the whole of the remaining effects, as soon as their value might be reduced within his debt, but not within that of the minor creditors. The circuit judge erred in excluding evidence of other debts, and in the instructions given the jury on this point.

The circuit judge, upon trial, admitted on defendant's part, evidence of his damage from loss of credit, and interference with his prospective business profits. This was error. In the assessment of damages upon an attachment bond, made in the action, there is no issue of malice or want of probable cause. It is simply the truth of the naked fact which is put in issue—not whether the plaintiff acted maliciously or wantonly, without probable cause to believe the fact. In such cases damages must be compensatory merely, and confined to the actual loss from deprivation of the property attached, or injury to it; or, in case of closing business, to the probable profits of the business during the time of its stoppage. Injury to credit

and loss of prospective profits thereby, is too remote and speculative. Damage from that cause can not be assessed in an action on the bond, or in the attachment suit. If recoverable at all, it must be in a separate action on the case. The damages were assessed on an erroneous principle, and are, moreover, clearly excessive.

The defendant, on the trial, was his own principal witness. The plaintiff offered, but was not allowed, to impeach his testimony, by proof of his character for truth and veracity in the neighborhood where he had been living until within a few months before the trial. The judge held, as a point of law, that the proof of his reputation should be confined to the neighborhood in which he lived when his testimony was given. It was in the discretion of the judge to admit or refuse such testimony according as he might think it too remote or fairly proper to assist the jury in judging of the present veracity of the witness. He should have exercised that discretion. It was held in *Snow v. Grace, 29 Ark., 131,* that such testimony was admissible. In a recent Alabama case (*Kelly v. State, 61 Ala., p. 19*), it was held that the character of a witness might be impeached by the testimony of one who had, three years before, lived in the same neighborhood with him, and knew his past and present character in that neighborhood, although he knew nothing of it in the neighborhood to which the witness sought to be impeached had removed, and where he then resided. In this case, the interval was comparatively very short, and a sound discretion if exercised would have permitted the impeaching testimony to go to the jury for their consideration.

For the errors indicated, the verdict of the jury should, in any view of this case, have been set aside, and the

judgment rendered thereon, arrested. It must now be reversed.

Before remanding the case, it is deemed expedient to indicate the proper practice in this and like cases. This involves a construction of our system of attachment laws, which do not seem sufficiently clear to avoid misapprehension by the courts and the profession.

Before the Civil Code, the action by attachment was *a suit* of a peculiar character and of statute creation. The writ was not merely an ancillary remedy, aiding a common-law suit, which might proceed *proprio vigore*, regardless of the attachment itself. The complaint was, indeed, like that of a common-law suit, but it was so combined with the affidavit and writ as to make altogether an action *sui generis*. There was no summons independently of the writ, which was so essential to the continued vitality of the action that it could not be separately abated for any defect. A plea in abatement of the writ of attachment went to the whole action. It was regarded as a whole thing—a new form of action. *Edmonson v. Carroll, 17 Ark.*, citing *Childress v. Fowler, 9 Ark., 159.*

Except that, in either of the two contingencies, it might by force of the statute, be converted into a common-law suit. If the defendant chose to give bond to appear and answer, and to pay any judgment that might be rendered against him ; or if, *having first appeared and pleaded*, he should successfully except to the affidavit upon which the writ was issued, then the attachment would be released and the suit would proceed as other suits at law. The connection could be no otherwise dissolved, and without that the suit remained an entirety. The profession became used to designate it a "suit in attachment," or "an

attachment" simply, as they would say "replevin" or " detinue."

So the law stood until the act of March 7, 1867, amending the attachment laws, which furnished a new ground upon which the attachment might be dissolved. This was by a sworn plea on the part of the defendant, denying the truth of the grounds assigned for the writ in the plaintiff's affidavit. The effect of such a plea was to dissolve the attachment, and throw upon the plaintiff all the costs of the suit to that time, unless his affidavit should be supported by other sufficient evidence. He had the burden of proof. No mode nor time for the trial of this issue was specially directed by the statute, but the inference is strong that it was intended to be interlocutory. The judgment on it was simply to maintain the attachment, or dissolve it with costs *up to that time.*

Other amendments were made by the act. Before its passage, the bond of the plaintiff entitled him to the writ; and the counter-bond of defendant entitled him to its dissolution, and the restoration of the property. Neither, *in the action,* was entitled to any remedy against the other on the bond. The act provided that upon the failure of the plaintiff in his *suit,* in any " suit by attachment," either upon trial of issues made, *or otherwise,* the defendant might have a writ of inquiry to assess his damages on the bond, and judgment against the plaintiff and his sureties for the amount; and if, on the trial of *such suit,* judgment should be rendered against the defendant, it should go against the sureties in his bond also, to the extent of the appraised value of the property released. These provisions preceded that allowing the contest concerning the truth of the affidavit, and evidently refer to the final trial in the attachment suit. Although, on account of false or defective affidavits,

the attachment may have been dissolved, and the property restored, his bond remained good against the plaintiff, and damages might be assessed upon it in case of, but not before, his final failure in the suit.

The practice under this system, thus plainly indicated, would have been easy, just and equitable; but time was not allowed to establish it.

The provisions of the Civil Code of 1868 covered the whole ground of attachments; and, as has been held, superseded all former laws within its scope. This made the confusion incident to all such sweeping experiments. Useful timbers are apt to be omitted in the reconstruction, and to complete the system, subsequent legislatures must gather up, and work in again, these *disjecta membra*. The principal features of the new system were the same as those of the old, though not taken from them. The whole "Code of Civil Practice" was not devised with reference to our body of existing laws, or even the existing constitution; but taken from the judicature of a neighboring state, to which it had been adjusted, and thrown into ours, to be adjusted as the courts might find themselves able. This duty we recognize, and must endeavor to perform. The attachment was made to be merely ancillary to an action at law, and might be had either *at* or *after* its commencement. This was consistent with the abolition, in name, of all forms of action. The "suit in attachment" no longer retained its peculiar and exceptional form and characteristics, no more than any other class of actions. To obtain the writ of attachment, in any action, affidavits and bonds were required, as formerly, with slight modifications. The defendant was allowed to contest the truth of the affidavit, not by *plea*, as formerly, but by counter affidavit, and hearing by the court on *motion*, and upon affidavits of the parties, depositions,

and such oral proofs as the court might permit to be adduced. This is the usual mode of raising and determining all interlocutory questions. No difference was made in the mode of disposing of motions to dissolve on account of the *falsity* of the grounds sworn to, and those to dissolve for other reasons. The Code provided that if " *the court* should be of opinion that the grounds of the attachment are not sustained, the attachment should be discharged, subject, however, to reinstatement before final judgment.

A mode of reinstatement was attempted to be provided, *pendente lite,* through a judge of this court. This was one of the provisions of the adopted Code, which could not be made to fit into our constitutional system of courts; and it has been, necessarily, disregarded in practice. The provision remains historically useful in construing other portions of the system—indicating its intention to be, that the attachment should not be considered as finally disposed of, until the determination of the action. Evidently, the practice of summoning a jury to determine the truth of the facts alleged as grounds for attachment, was not contemplated. It was an interlocutory issue, not going to the merits of the action, but questioning the right to the ancillary remedy. The mode of trial prescribed was not the usual one for trying issues of fact raised by pleadings. The order of the court, upon the result, was simply to be in discharge of the attachment, or to maintain it; that is, to determine whether, pending the action, the property should be restored to the defendant, as wrongfully taken, and prematurely, or retained in court, under custody of law, to await judgment and execution. The decision, and order of the court, unless excepted to at the time, and reversed on appeal, became, between the parties *res judicata,* and might be used in a suit on the bond for damages. How-

ever that might be, the point now under consideration is, that the Code did not contemplate a trial by jury, on a motion to dissolve an attachment. (*Gantt's Digest, secs. 457, 458, 459.*) Doubtless, a judge may, if he chooses, of his own motion, refer to a jury any matter of fact whatever. It would not be error in him to so refer such an issue as the one in question. (*Ib., sec. 4642.*) But in view of the construction of subsequent acts, it is important to know what practice the legislature intended, in ordinary cases. The sections, above quoted, are parts of the Kentucky system, and were brought over, *verbatim* and *in situ*, with the body of her civil practice. (Compare *Myer's Code of Kentucky Practice, sections 289, 290, 291.*) Under them, it was held by the supreme court of that state that the motion to discharge an attachment should be tried by *the court*, and that a party was not entitled to a trial by a jury. (*Talbot v. Pierce, 14 B. Monroe.*) Whilst this court would not feel constrained, in all cases, to adopt a construction given by the supreme court of another state to the language of a state statute, which our legislature had adopted; yet it confirms us in our views to find them in accordance with the supreme court of the state from which the law in question was taken. The Code, in furnishing us a new system of attachment laws, omitted a provision to which our sense of justice had become accustomed. No judgment *in the action* could be rendered, on the bonds, against sureties of either plaintiff or defendant. The system needed readjustment, and hence the act of November 10, 1875. It is in one section, providing:

"That in all actions of attachment now pending, or hereafter instituted, in which the defendant shall recover judgment for the discharge of the attachment, the court or jury trying said attachment, shall assess the damages sustained

by the defendant, by reason of such attachment, and the court shall render judgment against the plaintiff and his sureties in the attachment bond for the amount of such damages, and cost of attachment. But if the plaintiff shall recover against defendant, and the attachment shall have been discharged upon the exe*ution of a bond, as prescribed by *section 416, of Gantt's Digest*, then the court shall render judgment against said defendant and his sureties in said bond for the amount recovered, and the cost of said suit. But if the defendant shall have given bond for the retention of the property attached, as provided by *sec. 406, of Gantt's Digest*, and the attachment shall be sustained, the court, or jury, in addition to finding the amount of debt or damages due to the plaintiff, shall, on demand of the plaintiff, also assess the value of the property attached," etc.—proceeding to provide for judgment against the sureties in defendant's bond for the value of the property, or the whole debt, if less than the value.

The first clause of this section, standing alone, would be doubtful in meaning. It speaks of the "action of attachment," in the old sense, as if it remained a separate and distinct form of action. It speaks of "the court or jury trying said attachment," without designating *what* trial is meant—whether of the merits upon the pleadings, or of the truth of the grounds upon affidavits and motion. Inasmuch as it had become the habit to designate an action begun with an attachment, as an "action of attachment," or an "attachment," and inasmuch as there was no mode directed, by existing laws, for the trial of any other issue in the suit, than the issue in the action, made by the pleadings, the inference from this clause alone, might well be, that the act meant to empower the court or jury trying the *final* issue to fix the damages.

The doubt vanishes on continuing to read the section with the conjunction "but." The continuing part is thus made to refer to *the same* trial, on the contingency of the *plaintiff's recovery*. This could only happen on the final trial of the merits in the principal action. If a distinction had been intended between the trials at which defendant might have assessments of damages, and plaintiff assessments of values of retained property, the draughtsman of the act would have been certainly prompted to the use of more appropriate language to make it clear. It is plain that the legislature did not intend judgment for damages, and execution against the plaintiff and his sureties before the final disposition of the case.

The best practice founded upon all the acts, is, to try the truth of the facts put in issue by the counter affidavit of defendant, and the motion to dissolve, by the court, as an interlocutory motion. If found for defendant, the attachment should be dissolved, and the property released. Exceptions may be reserved, and the ruling on this point will be subject to revision on appeal from the final judgment. But until corrected it becomes *res judicata* between the parties, as establishing the fact that the attachment was wrongfully sued out. In case there should be a trial by jury, or the court, of the issues in the principal action, the damages on the respective bonds of plaintiff and defendant may then be assessed against them and their sureties.

If there should be no final trial and the main suit be otherwise disposed of, there is no direct and mandatory provision of any statute for the assessment of damages on the bond in the action. The act of 1867 made such a provision, by giving defendant the right to have a writ of inquiry, in case the plaintiff should fail in his action from

Holliday Bros. vs. Cohen.

any cause. That act has, as we said, been superseded by the Code provisions.

There is, however, such an analogy between the acts of 1875 and 1867, that the impression is strong in the profession, and upon our minds, that the legislature meant to return to the policy of the latter act, which policy had been disturbed by the Code provisions, and to leave it with the court, through proper instrumentalities, to settle in one suit, the whole of the litigation arising not only out of the original cause of action, but also out of the bonds executed in its progress. We think it, therefore, within the equity and spirit of the act, as a matter of practice, that the defendant should have the right, when the plaintiff shall fail to bring his suit to final trial, or may fail otherwise, to have a jury summoned on his own behalf, to assess the damages which may have accrued to him from a wrongful attachment in the action, and which had been dissolved.

It is certainly unreasonable, and a bad practice, which may lead to great injustice, to have an assessment of damages, judgment and execution in favor of defendant, upon an interlocutory trial, when, in the end, the plaintiff may recover a larger sum on his debt, and find the defendant insolvent. One trial should settle all, and damages may be set off when fixed; and a final judgment rendered on one or the other side for a balance.

Let the judgment be reversed for the errors above indicated, and the case be remanded for further proceedings consistent with law and this opinion.