[S. F. No. 9459. In Bank.—December 20, 1920.]

In the Matter of the Guardianship of the Person and Estate of WILLIAM DAVID AKERS (a Minor). GRACE AKERS, Appellant; CHRISSIE SHREVE, Respondent.

[1] GUARDIANSHIP OF MINOR—COMPETENCY OF PARENT—PRESUMPTION. A parent is presumed to be competent to discharge the duties of guardianship in the absence of an affirmative showing to the contrary.

[2] ID.—FITNESS OF MOTHER—EVIDENCE—GENERAL REPUTATION.—The general moral character of the mother of a child is involved in the issue of her fitness to have its care, and evidence of her reputation for truth, honesty, and integrity is admissible under such issue.

[3] ID.—LACK OF INTEGRITY—INSUFFICIENT PROOF OF UNFITNESS.—A mere lack of integrity is not sufficient in itself to justify depriving a parent of the natural right to the custody of a child.

---

1. Right of parent to appointment as guardian of minor child, note, 33 L. R. A. (N. S.) 868.

[4] ID.—PRIOR REPUTATION — EVIDENCE—DISCRETION.—The admission of evidence of the reputation of the mother of a child in another community and at a remote time rests largely in the discretion of the trial court, the proper exercise of which is dependent upon the question of whether or not, under all of the circumstances, such reputation, despite its remoteness as to time and place, has a tendency to establish reputation at the precise time and place when and where it is in issue.

[5] ID.—DECLARATION OF HUSBAND—ADMISSION OF ILLICIT RELATIONSHIP OF MOTHER—PREJUDICIAL TESTIMONY.—In a contested proceeding for the guardianship of the person and estate of a minor, involving the fitness of the mother, the admission of a declaration made by her husband to a city chief of police some five or six years previous that the declarant was bent on killing a certain person because his wife had confessed to him that she had had illicit relations with such person was reversible error.

[6] ID.—ABANDONMENT OF CHILD—INSUFFICIENCY OF EVIDENCE.—An abandonment of a child by its mother is not established by proof that, being dissatisfied, if not discouraged, with the prospect of being compelled indefinitely to bear the burden of supporting herself and her husband, she separated from him, and, after an unsuccessful endeavor to have the child placed with and cared for by its grandmother, left for fields anew to work out her own salvation single-handed and alone.

[7] ID.—INSUFFICIENT ACTS OF ABANDONMENT.—The right of a parent to the custody of its child cannot be held to be forever forfeited by an act of relinquishment committed under circumstances of coercion, caprice, and discouragement, nor should the forfeiture of parental rights be decreed against a parent who has merely acquiesced in the support of the child by other relatives.

[8] ID.—INTENTION TO ABANDON—ESSENTIAL ELEMENT.—An intention to abandon a child must be shown before a finding of abandonment can be rightfully made.

[9] ID.—PARAMOUNT RIGHT OF PARENTS.—The care, custody, and control of a minor under the age of fourteen years must be committed to its parents, rather than to strangers, unless it be shown and found that the parent is unfit to perform the duties imposed by the relation or has, by abandonment, forfeited the natural right to its custody.

[10] ID.—CONTEST BETWEEN PARENT AND STRANGER — PARAMOUNT QUESTION.—In a contest for guardianship of a minor between a parent and a stranger, the paramount question is the competency of the parent, despite the fact that the material welfare of the child may perchance be enhanced by committing its care and custody to another person.

[11] ID.—WANT OF PERMANENT HOME BY MOTHER — INSUFFICIENT
GROUND FOR REFUSAL OF GUARDIANSHIP.—Even though it be
shown that the mother of a child has not at the time of the
hearing of the guardianship proceeding a permanent home of her
own, and therefore may be unable for the time being to keep the
child with her personally, nevertheless she is not for that reason
alone to be deprived of its legal custody and the related right of
selecting a fit and proper place where it shall be kept and cared
for.

APPEAL from an order of the Superior Court of the City
and County of San Francisco appointing a guardian of the
person and estate of a minor. Frank H. Dunne, Judge.
Reversed.

The facts are stated in the opinion of the court.

Lovett K. Fraser and H. B. Churchill for Appellant.

Edmund Tauszky and Leon E. Prescott for Respondent.

LENNON, J.—This is an appeal by Grace Akers, the
mother of William David Akers, a minor of the age of seven
years, from an order of the superior court of the city and
county of San Francisco appointing Mrs. Chrissie Shreve
guardian of the person and estate of said minor. The guard-
ianship proceeding was heard and determined upon the issues
raised by the respective petitions for the guardianship of the
said minor, and the answers thereto, of Grace Akers, the
mother of the minor, and Mrs. Shreve. The issues thus pre-
sented involve the questions of the abandonment of the child
by the mother and the latter's fitness and competency to have
the care, custody, and control of the child. In its findings
of fact, the court below found, among other things, that
Grace Akers, the mother of the child, in the month of No-
vember, 1915, abandoned the child and then, and ever since
then, surrendered all her parental rights to said child, and,
furthermore, that she was not a fit or proper person to have
the care, custody, or control of the child, nor a competent
person to be the guardian of the person or estate of the child.
A reversal of the order is urged upon the ground that these
findings are not supported by any competent evidence.

The uncontradicted evidence offered and received in sup-
port of the application of the mother shows that Grace Akers

was married at the age of seventeen years at the home of her mother, in Whispering Pines, Lake County, to Earl Akers, August 8, 1912, and that Earl Akers at that time was about thirty-five years of age. For a period of four months thereafter she and her husband were domiciled in the home of her mother. From there the couple went to reside in Lakeport, where her husband secured employment on a stage-line, and there they remained for a period of five months, when they returned to the home of Mrs. Akers' mother, where the child in controversy was born. When the child was three or four months old, the Akers removed to Cobb Mountain, where they resided for about five months, Mrs. Akers all the while being employed as a cook for a saw-mill crew of seven men. Then the family moved to Napa City, where they occupied a seven-room house for the period of a year or more, and during that time Mrs. Akers, in order to support the family, took in roomers, boarded three men, and took in family washing and ironing. The Akers family returned to the home of the mother of Mrs. Akers and, after three or four months there, Mrs. Akers secured employment at Adams Springs, in Lake County, her husband and child remaining in the meanwhile at her mother's home. During a small portion of the time mentioned, the husband was incapacitated for work and, during most of the time, was unable to secure more than occasional employment at his trade, that of machinist. After working four or five months at Adams Springs, Mrs. Akers decided to separate from her husband because of his refusal, or inability, to support her, and she did so, leaving the child with her mother.

Shortly after the separation, her husband forcibly took the child from the grandmother and placed it with his sister in Middletown. Mrs. Akers proceeded to Middletown and succeeded in having the child returned to and placed in the care of the grandmother. The husband again forcibly took possession of the child and placed it in the custody of Mrs. Shreve, at Calistoga, who agreed with the husband to keep and care for the child for the sum of twenty dollars per month. The mother made no further effort to regain control of the child and moved to San Francisco, where she resided with her sister, a married woman having a family of five children, and in that city supported herself for four years, working under the name of Grace Miller, at times, as a day waitress

in restaurants, as a servant in apartment houses, and as a helper in an airplane factory. During these four years she visited the child once at Calistoga and sent the child handkerchiefs and candy. Leaving San Francisco, she went to Globe, Arizona, where she worked for three weeks as a waitress under the name of Grace Lien (she explained that she was working under assumed names because she did not want her husband to know where she was), and then went to Douglas, Arizona, where she purchased a candy-store under an installment contract, and conducted the same in person.

Her husband died in November, 1919. Upon receiving news of his death, Mrs. Akers wrote from Douglas, Arizona, to her mother to get the child, and then came to San Francisco to oppose Mrs. Shreve's application and prosecute her own application for the guardianship of the child. When leaving Douglas, Arizona, she placed the candy-store in the hands of an agent to be sold, and decided that she would not return to Arizona save for the purpose of consummating the sale of the store. Mrs. Akers' mother owns and lives on a six hundred acre ranch in Lake County, has a comfortable home, is well able to care for the child and its mother, and would willingly provide a home for both.

The ability and fitness of Mrs. Shreve to have the care and custody of the child was not disputed. In support of her application and in opposition to the application of Mrs. Akers, evidence was offered and received in an endeavor to show that Mrs. Akers, some five years prior to the institution of the guardianship proceedings and particularly during the period of her married life when she was living with her husband, was guilty of immoral conduct of so grievous a nature as to render her incompetent to have the care and custody of the child then or at any time since then.

Upon that phase of the case, the only competent evidence adduced was to the effect that, when living in Napa City, some five or six years prior to the hearing of the application for guardianship, the reputation of the mother of the child for "truth, honesty, and integrity was bad"; that at that time she associated with another woman whose reputation for "truth, honesty, and integrity was bad"; that on several occasions she was seen in restaurants at varying hours of the night with this woman and two men; that some three or four men were seen going regularly to her house and that on one

or more occasions she went automobile riding with one of these men. The mother explained, and it was not only not disputed, but it was in effect admitted, that these men were either roomers or boarders, and therefore had a legitimate purpose in going to her home. The automobile rides, so the mother explained, and in this she was not contradicted, were with a man who not only boarded with the family, but was, as well, a particular and intimate friend of the husband from boyhood. She further testified that these rides were had with the knowledge and consent of her husband. It was not shown nor claimed that they were clandestinely taken, nor that they or the visits of the mother to restaurants in company with one other woman and two men were for any but a legitimate and innocent purpose. Mrs. Akers' mother, sister, and nephew, the latter a young man of the age of eighteen years, testifying in her behalf, gave evidence tending to show that her reputation before, at, and at all times subsequent to her marriage was in every respect good.

There was uncontradicted evidence to the effect that the mother, after separating from her husband, lived and worked under assumed names because he had threatened to kill her and, therefore, she desired to conceal her whereabouts from him. It was also shown in evidence against the mother that some several years before the hearing and while she was living with her husband she had written and addressed a letter to one of the men who was boarding with her, wherein she declared that he, meaning her husband, was "getting worse and worse till it is impossible to stand it," and then begged the man to whom the letter was addressed to always remember that he "had the first pure love of one woman." It was, however, an undisputed fact in the case that this letter, evidently written in a moment of caprice, had never been mailed or delivered to the person to whom it was addressed and that it was written in the presence of the husband.

[1] In accordance with the general presumption in favor of competency, a parent is presumed to be competent to discharge the duties of guardianship in the absence of an affirmative showing to the contrary. (*Guardianship of Salter,* 142 Cal. 412, [76 Pac. 51]; *Matter of Forrester,* 162 Cal. 493, [123 Pac. 283]; *Matter of Galleher,* 2 Cal. App. 364, [84 Pac. 352].) [2] We may assume that, inasmuch as the general moral character of the mother of the child is in-

volved in the issue of her fitness to have the care of her child and the particular traits of character relevant to the issue are not clearly defined, evidence of her reputation for truth, honesty, and integrity, was admissible under that issue. [3] Although it may not be amiss to say that a mere lack of integrity is not sufficient in itself to justify depriving a parent of the natural right to the custody of the child. (*Matter of Galleher, supra.*) [4] It may be conceded that the admission of evidence of such reputation in another community and at a remote time rested largely in the discretion of the trial court, the proper exercise of which as a matter of course was dependent upon the question of whether or not, under all of the circumstances, such reputation, despite its remoteness as to time and place, had a tendency to establish the mother's reputation at the precise time and place when and where it was in issue. (*Coates* v. *Sulau*, 46 Kan. 341, [26 Pac. 720]; *State* v. *Lanier*, 79 N. C. 622; *Snow* v. *Grace*, 29 Ark. 131; *Holliday* v. *Cohen*, 34 Ark. 707; *Cline* v. *State*, 51 Ark. 140, [10 S. W. 225].) While it cannot be said, under the circumstances of the case at bar, that the court abused its discretion in permitting proof of the mother's prior reputation for traits of character relevant to the issue of her fitness to have her child, still we are not satisfied that, standing alone, the competent evidence adduced upon this phase of the case would have impelled the trial court to the conclusion that the mother was not a fit and proper person to have the care, custody, and control of her child. Counsel for respondent must have been possessed of the same misgiving when they insisted, despite repeated timely and appropriate objection, upon having in evidence the testimony of the chief of police of Napa City to the effect that the husband of Grace Akers had said to him, some five or six years before, that he, Akers, was bent on killing a certain man because she had confessed to him, Akers, that she had had illicit relations with that certain man. Hearsay evidence as to the statements of particular persons in regard to the commission of particular acts by a party is inadmissible for the purpose of proving character. [5] Obviously this was hearsay and its prejudicial effect is instantly manifest. When overruling the objection to it, the trial court made the following comment: "No. I want to hear about that. They don't say things like that about good women.

You don't assume that a husband would go about telling stories of that kind about his wife if she were a good woman, do you?'' This statement indicates with much certainty that the evidence erroneously admitted contributed materially to, if it did not entirely control, the conclusion of the trial court, ultimately expressed in its findings, that the mother was not a fit and proper person to have the care and custody of her child.

It follows necessarily that the error in this particular warrants and requires a reversal of the order, unless it can be said, as counsel for respondent contend, that the finding of the trial court that the mother had abandoned the child is supported by evidence and that that finding alone will suffice to support the order appealed from.

[6] Upon that phase of the case, the evidence in its entirety does no more than show that, being dissatisfied, if not discouraged, with the prospect of being compelled indefinitely to bear the burden of supporting herself and her husband, the mother of the child separated from her husband and, after an unsuccessful endeavor to have the child placed with and cared for by its grandmother, left for fields anew, far removed from the ''Whispering Pines,'' to work out her own salvation single-handed and alone. Whether or not she was justified in separating from her husband need not be determined here. [7] Suffice it to say that the right of a parent to the custody of its child cannot be held to be forever forfeited by an act of relinquishment committed under circumstances of coercion, caprice, and discouragement. (*Norval* v. *Zinsmaster*, 57 Neb. 158, [73 Am. St. Rep. 500, 77 N. W. 373].) Nor should the forfeiture of parental rights be decreed against a parent who has merely acquiesced in the support of the child by other relatives. (*Matter of Forrester*, 162 Cal. 493, [123 Pac. 283]; *Matter of Galleher*, 2 Cal. App. 364, [84 Pac. 352].) [8] In so far as the record before us shows, the mother did nothing which indicated an intention to abandon the child, and it is well settled in this state that such an intention must be shown before a finding of abandonment can be rightfully made. (*In re Vance*, 92 Cal. 195, 198, [28 Pac. 229]; *Guardianship of Snowball*, 156 Cal. 240, [104 Pac. 444]; *In re Cordy*, 169 Cal. 150, [146 Pac. 532, 534]; *In re Schwartz*, 171 Cal. 633,

[154 Pac. 304]; *Moch* v. *Superior Court,* 39 Cal. App. 471, [179 Pac. 440].)

The record reveals that the trial court made the order appealed from largely, if not entirely, upon the theory that "the only purpose in an inquiry of this kind is to determine what is best to be done with the child for its own welfare, and the question as to the character and reputation, fitness or unfitness, of the mother in a case of this kind, seems to me to be not the most important one." That this was the attitude of the trial court is evidenced by the further statement: "I don't know of any higher law than that this child be cared for and that it be in the custody of people who are able and willing to support it, and they have done that and shown that for these four years." It is now insisted by counsel for respondent that, regardless of the erroneous admission of palpably prejudicial evidence and apart from the question of the insufficiency of the evidence to support a finding of abandonment, the order appealed from should be affirmed upon the theory indicated and adopted by the trial court. [9] This we cannot do, because it is the settled rule of law in this state that the care, custody, and control of a minor child under the age of fourteen years must be committed to its parents, rather than to strangers, unless it be shown and found that the parent is unfit to perform the duties imposed by the relation or has, by abandonment of the child, forfeited the natural right to its custody. [10] In short, in a contest for guardianship, as here, between a parent of a child and a stranger to the child, the paramount question is the competency of the parent to act as guardian, and, in the absence of a justifiable finding of the parent's incompetency, the court must appoint the parent as guardian despite the fact that the material welfare of the child may perchance be enhanced by committing its care and custody to another person. (Code Civ. Proc., sec. 1751; Civ. Code, sec. 246, subds. 3, 4; *In re Campbell,* 130 Cal. 380, [62 Pac. 613]; *Guardianship of Salter,* 142 Cal. 412, [76 Pac. 51]; *Matter of Forrester,* 162 Cal. 493, [123 Pac. 283]; *Guardianship of Mathews,* 169 Cal. 26, [145 Pac. 503].) The case of the *Guardianship of Imperatrice,* 182 Cal. 355, [188 Pac. 48], is not in conflict with anything now or heretofore held by this court in cases of this character. That case clearly recognizes the rule that primarily the parents of the child have the pref-

erential right to its custody by nature and statutory enactment, and it does no more than hold that this right must give way in the presence of a sufficient showing, as was made in that case, that the mental and moral delinquencies of the parents made them unfit and incompetent to be the guardians of the child in controversy. While the recent case of the *Guardianship of Hawkins*, 183 Cal. 668, [192 Pac. 30], does not in terms make the distinction which obtains in the operation of the rule in question when applied to parents asserting the right of guardianship as against a stranger, nevertheless the decision in that case in effect recognizes the distinction by proceeding throughout upon the theory that the evidence sufficiently showed the incompetency of the parent seeking guardianship, and, of course, in that situation the welfare of the child was the paramount point to be considered, in keeping with the rule so concisely and clearly stated in the case of the *Guardianship of Allen*, 162 Cal. 625, [124 Pac. 237], cited as an authority in the case last referred to.

Finally, it is said that, in any event, the mother should be denied guardianship because it appeared that she was no longer a resident of the state of California. In response to this contention it will be enough to say that the evidence showed that she returned to California with the intent and purpose of residing in California and regaining the custody of her child, and that, if she returned to Arizona, it would be only temporarily and for the purpose of disposing of her business there. [11] In conclusion, it may not be amiss to say, as was said in effect in the *Guardianship of Mathews*, *supra*, that, even though it was shown that the mother had not, at the time of the hearing, a permanent home of her own and, therefore, might be unable for the time being to keep the child with her personally, nevertheless she should not for that reason alone be deprived of the legal custody of the child and the related right of selecting a fit and proper place where he should be kept and cared for.

For the reasons stated the order appealed from is reversed.

Angellotti, C. J., Wilbur, J., Olney, J., Shaw, J., Sloane, J., and Lawlor, J., concurred.