[Civ. No. 8694. Third Dist. Aug. 24, 1955.]

NORMA JEANNE ASHWELL, Appellant, v. CURTIS LEE ASHWELL, Respondent.

*Assigned by Chairman of Judicial Council.

Malone, Dennis & Schottky for Appellant.

Johnson & Lemmon for Respondent.

VAN DYKE, P. J.—On August 17, 1953, an interlocutory decree of divorce was entered in an action brought by Norma Jeanne Ashwell, appellant herein, against Curtis Lee Ashwell, respondent herein. The decree was granted to Norma upon the ground of extreme cruelty and upon default of Curtis. Custody of the four children of the marriage was given to Norma. The oldest of the children was 6 and the youngest less than 2. During the interlocutory period and on January 19, 1954, Curtis filed a notice of motion to modify the interlocutory decree by taking the custody of the children from Norma and awarding that custody to Curtis. The notice of motion stated that the modification sought would

be to the effect that Norma was not a fit and proper person to have custody. After a hearing the existing decree was modified to give legal custody of the children to Curtis. There was no express finding that Norma was not a fit and proper person to have custody nor that she was not properly caring for them nor that she maintained them in an improper home.

If the order is to be supported upon the ground alleged in the notice of motion it can only be because, if such findings had been made, they would have been sustained by the evidence, for, unless that be so, then it seems clear to us that the change in custody constituted an abuse of discretion in view of the previous and recent adjudication that Norma was a fit and proper custodian and that the welfare of the children required that she have their custody and control; that is, there must be sufficient evidence that a change had taken place after the granting of the interlocutory decree and that thereby the welfare of the children was endangered. (*Munson* v. *Munson,* 27 Cal.2d 659 [166 P.2d 268]; *Prouty* v. *Prouty,* 16 Cal.2d 190, 193 [105 P.2d 295]—there the court said: "It must be borne in mind that in every proceeding to modify a provision for the custody of a minor child the burden is on the moving party to satisfy the court that conditions have so changed as to justify the modification." (*Washburn* v. *Washburn,* 49 Cal.App.2d 581 [122 P.2d 96]; *In re Inman,* 32 Cal.App.2d 130, 134 [89 P.2d 421]; *Foster* v. *Foster,* 8 Cal.2d 719, 726-728 [68 P.2d 719]—"until some change of circumstances arises which makes a modification of the former order of custody advisable from the point of view of the welfare of the child, the court will give effect to the former order and will refuse to make any modification of such order.") The fundamental issue in a child custody proceeding is whether, as of the time a modification is sought, such an order is reasonably necessary to the welfare of the children. In examining into that issue the court is to be guided "By what appears to be for the best interests of the child . . .", bearing in mind that "As between parents adversely claiming the custody, neither parent is entitled to it as of right; but other things being equal, if the child is of tender years, custody should be given to the mother; . . ." (Civ. Code, § 138.) In the resolution of the issue as to which of two parents shall have custody much is committed to the sound legal discretion of the trial court and the decision will not be reversed on appeal unless there is a clear abuse of discretion.

Norma has appealed from the order changing custody of the children and here urges that in this case the trial court did abuse judicial discretion and that the application of the foregoing rules demands a reversal of the order. Giving full scope to the showing made before the trial court, we are constrained to hold that appellant's contentions are sound and that the decree must be reversed.

A sufficiently full summary of the evidence follows: Norma gave birth to a fifth child on February 14, 1954 (conceived prior to the interlocutory decree). The father of the child was one Barney Cassella. Norma, the five children and Cassella were living in the same house when the motion to modify the decree was heard. Curtis was a master sergeant in the United States Army, stationed in Sacramento. That county had also been the situs of the domicile of the parties when the decree of divorce was granted. Curtis testified he had visited the children about once a week and a number of times had found them in charge of a 12-year-old girl. He said they were generally raggedly dressed in dirty clothes and appeared to need a bath; that whenever he visited Barney Cassella was always present; that Norma and the children had, after the decree, moved from a residence in Sacramento and were living in West Sacramento, across the river in Yolo County; that on December 23, 1953, at about 10 p. m. he visited there and Cassella answered the door and was improperly dressed (he did not specify in what the impropriety consisted); that Norma then told him she was pregnant, but denied that Cassella was responsible. Curtis stated to the court that if he obtained custody of the children he intended to get a discharge from the Army and take the children back to Virginia to live with his parents who were living on a farm three miles out of Huddleston; that the home was an average home, with access to schools and churches; that his parents were Mormons; that his mother was 45 years of age and his father 54 years old; that he, Curtis, is a mechanic by trade and had been offered a job in Huddleston and expected to support his children from his earnings. He said he had never seen any improprieties between Norma and Cassella.

Barney Cassella testified he was a taxi driver employed in Sacramento and since November 1953 had been living in the same house with Norma and the children; that he rented the house; that before that time he rented an apartment from Mrs. Ashwell in Sacramento; that he had had sexual intercourse with her several times, but not since June of 1953;

that he was the father of the child she bore February 14, 1954; that when he moved to West Sacramento it was to a house which he rented which had three bedrooms, one of which was occupied by him and his adult nephew, one by Norma with the new baby and the youngest Ashwell child, and the other by the three older children; that he loved Norma and intended to marry her as soon as her divorce became final. Norma testified that Cassella was the father of her last born child; that she and Cassella had had no sexual relations since she became pregnant in June of 1953; that she had not told Curtis at any time that Cassella was not the father of her last born child. In explanation of her conduct she testified that she had been compelled, while living in Sacramento and after her separation from Curtis, to rent an apartment to Cassella, and that the compulsion was from economic necessity; that she was compelled to leave her Sacramento home because Curtis came there at unreasonable hours and abused and insulted her beyond endurance; that she had moved into a house which Cassella rented because she could not afford a place of her own; that she loved Cassella and intended to marry him as soon as her divorce became final; that she had always properly cared for the children; that she loved them and devoted her full time to their care; that they were healthy and happy. She said: "I am living with Mr. Cassella now because of economic necessity. I receive $100.00 a month from him to apply toward the support of myself and my children. I cannot afford to live separate and apart from him at the present time. If my children were taken back to Virginia, I could not afford to go there to visit, and I would probably never see them again." Two women, neighbors to Norma, testified that Norma was a good mother, cared for her children well and that they appeared to be healthy, happy, normal children; that she was conscientious and never neglected or abused her children in any way.

The order appealed from was made on the 25th of March, 1954; the interlocutory decree had been entered August 17, 1953; and the final could not be entered until about five months after the entry of the order modifying the interlocutory.

It is clear that this decree must rest upon an assumption that the trial court concluded Norma was not a fit and proper person to have the custody of her children despite their tender ages, even though the court did not see fit to so declare. This is so because there is nothing else upon which

the order could be based. The meager showing, disputed by the neighboring women, that there was anything amiss in Norma's care of her children can be dismissed as of no moment. Any normal, healthy, playing child of the ages of these children will at some time during almost every day be found to need a bath and there was no attempt here to show that in proper time these children did not get the needed ablution. Curtis said, additionally, that he found the children raggedly dressed, but he did not otherwise describe their clothes, and these children, described by the neighbors as healthy, happy, active children, probably were at times dressed in clothes that had been torn and needed mending. These things really do not measure up even to makeweights as against the imperative need of very young children for the constant care and love of the only person who can fill these needs in full measure—the mother who bore them. There is no worthwhile dispute here but that Norma took good care of her children, and if she did that then anyone who has observed the tasks that must be performed by a mother in caring for four tiny children will know that she is the hardworking, and, toward her children, the conscientious woman that her neighbors testified she was. If support is to be found for the order, therefore it must be found in her meretricious relations with Cassella resulting in the birth of a fifth child. Upon examination, and in view of the applicable case law and the statutory command, these derelictions do not measure up in quantity and quality to justification for depriving these children of their mother. Except for her relations with Cassella, there is nothing in this record to indicate that Norma is a loose woman. There is here no proof that she is amoral. There is proof of error, but along with it goes proof of her acceptance of the consequences and her expressed desire to regularize, within the possible limits, her habitation with Cassella, the father of her youngest child. These people could not marry until the final decree of divorce was entered, but they testified they intended to do so as soon as that could be done, and as we read this record there is no good reason to doubt that their testimony expressed their true intent. After all, they were bound by mutual obligations to their illegitimate child. Norma testified that she was compelled by economic necessity to depend upon Cassella for aid and that he was furnishing aid to her. This testimony could be construed as an indictment of her moral character, but we think it could not be fairly so construed. Five children below 7 years of age effectively

prevent a mother charged with their care from gainful occupation. The divorce decree awarded her $176 per month and she told the truth when she said that she was under economic pressure. Cassella was a taxi driver and there is nothing to show he was not a man with a moderate income derived from that occupation. These two people, regardless of their sin, were in all things else responding commendably to the demands of a burdensome situation. It is proper to bear in mind, as these things are being considered, that in determining where custody of children shall lie the courts are not engaged in a disciplinary action to punish parents for their shortcomings as individuals nor to reward the unoffending parent for any wrong suffered by the sins of the other. (*Washburn* v. *Washburn, supra,* p. 587.) The prime question is, what is the effect upon the lives of the children and what will be the effect of a modified decree that disturbs their settled life and compels them to make adjustments to a life with strangers. In view of the tender ages of these children we think that the conduct of the mother as described in the testimony was at the time this change was ordered having no possible bad effect upon them. They were too young.

 We turn now to the effect of the order granting the custody of these children to the father. In view of his expressed intention to remove the children to the distant state of Virginia for rearing by their grandmother, it is at once apparent that this decree in all practical effect gives the legal custody to the father and the physical care and custody to the grandmother whom the children have never seen; and by doing this prevents them from having any further contact with their mother whom they have always known and from whom they had received the motherly love, affection and constant care which good mothers give. Norma testified that she would not be able to visit her children and it is easily seen that unless her financial condition betters considerably in the future her testimony is true. The granting to her of visitorial rights under these conditions is an idle gesture. Curtis makes no claim that he could properly care for these children himself while he is in the Army and subject to be sent on the Army's missions at any time. His testimony was that if he received the children he would get a discharge from the Army and that he was in a position to do so upon request. Norma and Cassella testified they intended to marry as soon as they could. At the time this hearing was held both these promises could only be performed in the future. When the order was

made Curtis had no assured home for these children and the home they were in was not presently damaging to them. We think the situation was one that required denial of the motion if insisted upon at that time. It is apparent that, so far as shown here, if Cassella and Norma marry and keep for these children the home that they were then furnishing, a decree taking the custody of these infants from their mother could not be supported upon this record of her past delinquencies. If she does not marry, and continues in her relations with Cassella, then, obviously, the time is fast approaching when that condition will endanger the welfare of the children, but that is not the situation that confronted the trial court when it made its decree. On the other hand, if Curtis, given the children, should remain in the Army and leave the children with their grandparents they would be deprived of the needed constant parental care of both their parents. From the whole record we think the order constituted an abuse of discretion.

For the reasons given the order appealed from is reversed.

Peek, J., and Finley, J. pro. tem.,* concurred.

---

*Assigned by Chairman of Judicial Council.