[Civ. No. 17262. First Dist., Div. One. Jan. 21, 1957.]

Guardianship of the Person and Estate of SUSAN CAROL SMITH, a Minor. ELLEN HIGHTOWER, Respondent, v. MARJORIE EVANS SMITH, Appellant.

David L. Spaulding, Bruce Spaulding and Rankin, Oneal, Luckhardt, Center & Hall for Appellant.

Burnett, Burnett & Somers for Respondent.

PETERS, P. J.—Ellen Hightower, a resident of Santa Clara County, petitioned the superior court of that county to be appointed the guardian of the person and estate of her niece, Susan Carol Smith, a minor, who was born April 28, 1952. The mother of Susan, Marjorie Smith, a resident of Oregon, opposed the petition. Based on findings that it was necessary and convenient to appoint a guardian, that Mrs. Hightower was a fit and proper person to be appointed, and that Mrs. Smith was "unfit to have the care, custody and control" of the child, the court entered its order appointing Mrs. Hightower the guardian of the person and estate of Susan. From this order, the mother of the child appeals.

Mrs. Hightower is the aunt of Susan, being the sister of Susan's deceased father, Kermit Smith. The trial court, in its opinion, had the following to say about Mrs. Hightower:

"The Petitioner herein, Mrs. Hightower, is a person of unquestioned integrity with good training and education. It

was stipulated in open court by both parties that her home and family is of the highest type and that Susan would receive the best of care and attention. . . .

"In view of the above and of other evidence introduced in the case, there is no question in the Court's mind that Susan will always have a fine home with the Hightowers; receive a good education; be amply provided for and grow up to be a decent and respectable woman."

These findings are not challenged on this appeal. The two main contentions of appellant are that the Superior Court of Santa Clara County had no jurisdiction to appoint a guardian for Susan, and that there is no substantial evidence to support the finding that appellant, the mother of the child "is not a fit and proper person to have the care, custody and control of said child."

In support of her contention that the California courts have no jurisdiction of this guardianship proceeding, the appellant charges that the Hightowers brought Susan to California without the mother's consent; that the Hightowers were in effect guilty of child stealing; that the child never acquired a lawful residence in California, and that such residence is a condition precedent to the exercise of jurisdiction in this case.

Susan was brought to California under the following circumstances: In April of 1955 she was living in Oregon with her mother, the appellant, and her father, Kermit Smith. On April 21, 1955, Mr. Smith was murdered when a bomb exploded as he was getting into his automobile. One Lawrence Wolf confessed to the crime, and is now in jail in Oregon. Wolf implicated the appellant in the crime and she was arrested and charged with the murder of her husband. She was tried for the offense and acquitted by a 10-2 verdict, which, it is agreed, is an acquittal under Oregon law.

Mrs. Hightower, the respondent, is the sister of Kermit Smith. Upon hearing of her brother's murder, she proceeded to Oregon, and arrived shortly after appellant had been arrested. Susan had been first taken to a neighbor's house, and then an aunt of appellant arrived and took Susan to her house. Shortly thereafter Mr. Hightower called on the aunt and took Susan with him. Neither appellant's aunt, nor appellant's grandmother, also an Oregon resident, volunteered to care for Susan. No one objected to the Hightowers taking Susan to California. The child was kept by the Hightowers at their home in Santa Clara County until November of 1955, when Mrs. Hightower instituted the present proceeding seek-

ing appointment as the guardian of Susan. In this petition she alleged that there is a conflict of interest between Mrs. Smith and Susan; that she is informed and believes that Mrs. Smith killed her husband; that Mrs. Smith is unfit to be guardian of the child; that neither she nor her husband is interested in obtaining any funds from the estate of the child, and that she waives any rights thereto and to any support money from any person. Mrs. Smith made a general appearance in the proceeding, generally denying the allegations of the petition, and alleging that respondent had wrongfully taken the child from Oregon against appellant's will, and that she, appellant, was a fit and proper person to have the care, custody and control of Susan.

It is appellant's contention that Susan was "wrongfully" brought to California; that the only basis of jurisdiction over the guardianship proceedings is the physical presence of the child in this state; and that physical presence alone is not sufficient to confer jurisdiction. It is contended that under Oregon law the child was not in need of care when respondent removed her from that state and that, moreover, Oregon law provided a means for giving such care if it had been needed; that the child had not been "abandoned"; that the taking of the child from Oregon, under the circumstances, amounted to child stealing; that the finding of the trial court that under the circumstances then existing "it was not only the proper thing to do, but the dutiful thing to do" to take Susan to California is not supported by the evidence; that, under such circumstances, the California courts had no jurisdiction to appoint a guardian of the child. ▮▮▮ The contention is that the California courts have no jurisdiction over a guardianship proceeding where neither the child nor its parents are domiciled in this state. This, apparently, is the rule of the Restatement. (Rest., Conflict of Laws, § 145.)

California has not followed the mechanical rule of the Restatement. Section 1440 of the Probate Code confers jurisdiction to appoint a guardian upon the county where the minor "resides or is temporarily domiciled." In spite of this language, the California cases have held that courts in this state have jurisdiction to appoint a guardian whenever the best interests of the minor require it, and certainly where the child is physically present, regardless of where he may be technically domiciled. ▮▮▮ Although such a rule may result in two or more states having concurrent jurisdiction over the minor, the federal Constitution does not prohibit such a rule.

(*May* v. *Anderson*, 345 U.S. 528 [73 S.Ct. 840, 97 L.Ed. 1221]; see discussion 1 Survey of California Law 99; 3 Survey of California Law 143; see also Stumberg, *The Status of Children in the Conflict of Laws*, 8 Univ. of Chic. L. Rev. 42.) Thus, contrary to appellant's contention, the jurisdictional question involves solely the proper interpretation of California law.

In the instant case the child was physically present in Santa Clara County. The petitioning party, the respondent, resides there. The contesting party, the appellant, made a general appearance, and contested the petition. Thus, all interested parties were before the Santa Clara County court. There are many cases holding or implying that these facts are sufficient to confer jurisdiction on the California courts.

The pertinent code section, as already pointed out, is section 1440 of the Probate Code. So far as pertinent here, it provides: "When it appears necessary or convenient, the superior court of the county in which a minor resides or is temporarily domiciled, or in which a nonresident minor has estate, may appoint a guardian for his person and estate, or person or estate. . . ." This section was derived from section 1747 of the Code of Civil Procedure. That section contained the language "who are inhabitants or residents of the county." Under the Code of Civil Procedure section the cases uniformly held that physical presence in the county was all that was required to confer jurisdiction in such proceeding. (*Ricci* v. *Superior Court*, 107 Cal.App. 395 [290 P. 517]; *In re Green*, 67 Cal.App. 504 [226 P. 76].)

Although the language in section 1440 of the Probate Code differs from that in old section 1747 of the Code of Civil Procedure, section 2 of the Probate Code provides that the "provisions of this code, so far as they are substantially the same as existing statutes, must be construed as continuations thereof, and not as new enactments." Apparently, with this admonition in mind, the courts have not limited the Probate Code section, but have interpreted it as had been interpreted the former Code of Civil Procedure section. Thus, in *Guardianship of Phillips*, 60 Cal.App.2d 832 [141 P.2d 773], a mother brought her child, in violation of the custody order of another county, into the county where she filed the guardianship petition some eight days after her arrival. The court held that former section 1747 and present section 1440 should be interpreted in the same fashion, and that if the child were an "inhabitant" of the county seeking to exert jurisdiction that was sufficient. The court expressly rejected the argu-

ment that such jurisdiction could be defeated because the child was present in the county in violation of an interlocutory custody decree. (See also *Guardianship of Lee,* 123 Cal.App. 2d 882 [267 P.2d 847].)

In *Greene* v. *Superior Court,* 37 Cal.2d 307, 312 [231 P.2d 821], it was stated that "If the child is present or domiciled in California it is essential for the protection of his welfare that the courts of this state have jurisdiction over his custody." In *Titcomb* v. *Superior Court,* 220 Cal. 34 [29 P.2d 206], the court equated the phrase "resides or is temporarily domiciled" in section 1440 of the Probate Code, with "resides or inhabits" in old section 1747 of the Code of Civil Procedure, and also referred to the "inherent jurisdiction" of courts in this state to inquire into the custody of children present in this state. (See also *Guardianship of Cameron,* 66 Cal.App.2d 884 [153 P.2d 385].) There is also pertinent language in *Sampsell* v. *Superior Court,* 32 Cal.2d 763 [197 P.2d 739]. In that case a husband-father sought custody of his child in Los Angeles County. The wife-mother was in Nevada with the child establishing her "domicile" for purposes of divorce. Thus, the child was technically domiciled in Los Angeles County, but physically outside the state. The Supreme Court limited the application of certain prior cases, and concluded: "It is a sufficient basis for jurisdiction that the state 'has a substantial interest in the welfare of the child or in the preservation of the family unit of which he is a part . . . and this jurisdiction may exist in two or more states at the same time. (Stansbury, 10 Law and Contemp. Prob. *supra,* at 831.)' " (P. 780.)

Certain language in *Lerner* v. *Superior Court,* 38 Cal.2d 676 [242 P.2d 321], is also pertinent. There, the Supreme Court had the following to say (p. 681): "Although it may be assumed that the California decree would receive the same respect in other states that foreign custody decrees receive in our courts . . ., the physical presence of the child would give the foreign state jurisdiction to decide for itself what action would be in his best interests."

Several of the cited cases deal with custody questions rather than guardianship, but the Supreme Court has ruled that the two are substantially similar and should be, if possible, governed by the same rules. (*Titcomb* v. *Superior Court,* 220 Cal. 34, 41 [29 P.2d 206].)

From the above cases it is apparent that the courts of this state have adopted the common sense rule that the purpose of guardianship proceedings is to protect and promote

the best interest of the child, and will not permit that purpose to be frustrated by the raising of technical jurisdictional objections. Thus, so far as jurisdiction is concerned, how the child came to be in Santa Clara County is relatively unimportant. The fact is, that the child is physically present there. The only real jurisdictional question is, not how the child came to be within the county, but does the best interests of the child require that a guardian be appointed?

In passing on this question the law that is to be applied should be mentioned before the facts are discussed. The statutory guides are to be found in several sections of the Probate Code.

Section 1406 provides, in part: "In appointing a general guardian of a minor, the court is to be guided by what appears to be for the best interest of the child in respect to its temporal and mental and moral welfare . . ."

Section 1407 provides, in part: "Of persons equally entitled in other respects to the guardianship of a minor, preference is to be given as follows:

"(1) To a parent; . . .

"(4) To a relative . . ."

Section 1409 provides, in part: "A parent who knowingly or wilfully abandons or, having the ability so to do, fails to maintain his minor child under fourteen years of age, forfeits all right to the guardianship of such child . . ."

A literal reading of these sections would tend to indicate that it was the legislative intent that the best interests of the child should be the controlling factor, and that the right of a parent to be appointed only comes into existence when the parent is "equally entitled" to the guardianship with the contending person. But the cases have not so held. They have held that the best interests of the child require that the parent be its guardian unless that parent is unfit. (See generally, 2 Armstrong, Family Law, 993; 42 Cal. L. Rev. 514; 33 Cal. L. Rev. 306; 13 Cal. L. Rev. 54; *In re Campbell,* 130 Cal. 380 [62 P. 613] ; *Stever* v. *Stever,* 6 Cal.2d 166 [56 P.2d 1229] ; *Roche* v. *Roche,* 25 Cal.2d 141 [152 P.2d 999] ; *Guardianship of Smith,* 42 Cal.2d 91 [265 P.2d 888, 37 A.L.R. 2d 867].) In the Campbell case, *supra,* which is one of the leading cases establishing the "parental right" doctrine, the to the care and custody of his child and that the code provi- Supreme Court stated that the parent has a "natural right" sions "are to be regarded as but a re-expression of the principles of the common law governing the subject." (130 Cal.

at p. 382.) But as early as 1917 the Supreme Court began to recognize a "modern trend" to "regard as of primary importance the welfare of the minor himself" and followed the Campbell case rule with some reluctance. (*In re Mathews,* 174 Cal. 679, 683 [164 P. 8].) But in spite of some vigorous dissents (see *Roche* v. *Roche,* 25 Cal.2d 141, 144 [152 P.2d 999]; *Stewart* v. *Stewart,* 41 Cal.2d 447, 453 [260 P.2d 44]; *Guardianship of Kentera,* 41 Cal.2d 639, 645 [262 P.2d 317]; *Guardianship of Smith,* 42 Cal.2d 91, 98 [265 P.2d 888, 37 A.L.R.2d 867]), the majority of the Supreme Court still follow the "parental right" doctrine of the Campbell case. As an intermediate court we are, of course, bound by the decisions of the Supreme Court. ■ Therefore, we accept the rule as stated in one of the several opinions in *Guardianship of Smith,* 42 Cal.2d 91, at page 92 [265 P.2d 888, 37 A.L.R.2d 867], as follows: "It is settled in this state that in either guardianship proceedings or custody proceedings in a divorce action, the parents of a legitimate child have preference over a nonparent and the custody shall not be given to a nonparent unless the parent is found unfit."

■ In such proceedings the parent is presumed to be fit, and the burden is on the nonparent to establish the contrary. (*Stewart* v. *Stewart,* 41 Cal.2d 447 [260 P.2d 44].) ■ Fitness is to be determined as of the time of the hearing. (*Prouty* v. *Prouty,* 16 Cal.2d 190 [105 P.2d 295]; *In re Green,* 192 Cal. 714 [221 P. 203]; *Matter of Forrester,* 162 Cal. 493 [123 P. 283]; *Ashwell* v. *Ashwell,* 135 Cal.App.2d 211 [286 P.2d 983].) But the trial court has wide discretion in passing on the admissibility of evidence relating to the issue of present fitness, and may allow evidence to be introduced relating to the past conduct of the parent and of the nonparent for a reasonable period prior to the hearing. (*Prouty* v. *Prouty,* 16 Cal.2d 190 [105 P.2d 295]; *In re Hawkins,* 183 Cal. 568 [192 P. 30]; *Estate of Bedford,* 158 Cal. 145 [110 P. 302]; *Guardianship of Casad,* 106 Cal.App.2d 134 [234 P.2d 647]; *Guardianship of Jones,* 86 Cal.App.2d 35 [194 P.2d 141].)

Of course, the real issue in such cases is what is meant by the words "fit" or "unfit." ■ It is the rule, and properly so, that merely because the nonparent is more able than the parent to provide financial, educational or social benefits does not render the parent unfit. (*Stewart* v. *Stewart,* 41 Cal.2d 447 [260 P.2d 44].) The unfitness must directly relate to the relationship of parent and child.

■ Fitness is, of course, a question of fact, and the determination of the trial court that a parent is unfit will not be set aside in the absence of a clear showing that the evidence does not support the finding. (*Estate of Bedford,* 158 Cal. 145 [110 P. 302]; *Guardianship of Lewis,* 137 Cal. 682 [70 P. 926].) The burden on the one claiming unfitness of a parent is a heavy one. In *Matter of Galleher,* 2 Cal.App. 364, 370 [84 P. 352], the rule is stated as follows: "In examining the evidence in this case we have not overlooked the rule where there is a conflict in the evidence, or where different conclusions may be fairly drawn from the evidence, the appellate court will not interfere with the action of the trial court. But we have considered it in the light of the rule that a father is *prima facie* presumed to be competent to have the care and custody of his child, and can only be deprived of his right by an affirmative showing that he is incompetent. He is not shown to be incompetent by proof that he has some faults, or that he has not been or is not an ideal parent. There must be such a showing as to make it appear that he will probably fail in a substantial degree to discharge his duty toward his child."

None of the California cases has made or attempted to make a clear-cut definition of "unfitness," applicable to all guardianship or custody cases. (See *Guardianship of Willis,* 123 Cal.App.2d 446, at p. 450 [266 P.2d 944]; concurring opinion of Justice Traynor in *Guardianship of Smith,* 42 Cal.2d 91, at p. 94 [265 P.2d 888, 37 A.L.R.2d 867].) Because human relationships and human conduct are so variable and complex it probably is impossible, and certainly undesirable, to state or to try to state a fixed formula applicable to all cases.

It is impractical in the confines of this opinion to discuss all of the cases where the subject of the sufficiency of the evidence to sustain a finding of fitness or unfitness has been discussed. A few leading cases will be mentioned.

There are many cases where the finding of parental unfitness has been sustained on appeal. Most of these involve immorality of the parent, or neglect and ill treatment of the children by the parent. But not all of the cases are of this nature.

In *Guardianship of Shannon,* 218 Cal. 490 [23 P.2d 1020], the parents of the two minor children were divorced, the decree awarding the custody to each parent for six months of the year. The father remarried, and the two children lived with him and his new wife for five years. Then the father was killed. The stepmother petitioned to be appointed guard-

ian of the two children. The mother cross-petitioned. The trial court, based on a finding of unfitness of the mother, appointed the stepmother guardian. The mother of the children had remarried and her new husband agreed to furnish a home for the children. The Supreme Court emphasized the facts showing that it would be for the best interests of the children not to take them from the home where they had lived for five years. There was no evidence of immorality on the part of the mother, or of any bad relationships with her children. The only facts referred to in the opinion in connection with the finding of unfitness were that the new husband of the mother, although he had agreed to support the children, would be under no legal obligation to do so, and that he intended to reside in Canada. The court pointed out that this would remove the children from the jurisdiction of the California court.

In the case of *In re Hawkins*, 183 Cal. 568 [192 P. 30], the contest was between the maternal grandfather and the father of a 5-year-old child. The mother was divorced from the father when the child was 4 years old, and was awarded custody. A year later the mother died, and the maternal grandfather took the child and immediately applied to be appointed her guardian. The father contested the petition. The trial court found that the father was unfit, and this finding was held to be supported by the evidence. The evidence relied upon was to the effect that the father had mistreated the mother prior to their divorce, and had shown little interest in the child; that prior to the divorce, which was granted in Arizona, the husband had illicit relations with an unmarried woman whom he subsequently married; that in Arizona this woman had an unsavory reputation and was reputed to be a prostitute; that the father drank to excess; that he never wrote to or visited the child after the divorce. The father and his new wife moved to New York after the marriage, and the evidence was uncontroverted that in New York they had good reputations. Thus, their reputations at the time of the hearing, were good. Nevertheless, the court held the finding of unfitness was supported by the evidence of the father's past misdeeds.

The case of *In re Imperatrice*, 182 Cal. 355 [188 P. 48], contains some interesting language. There the contest was between the mother of three children, the father being dead, and a stranger in blood. The mother had been committed to a state hospital, where she stayed a year, and was then

restored to capacity. After being so restored, the court granted the stranger's petition to be appointed guardian, finding the mother to be unfit. There was evidence that prior to her commitment the mother had neglected the children. In upholding the trial court's action, the Supreme Court stated (p. 358) : ''And while primarily the parents of a child have the right, by nature and statutory enactment, to its custody, which right should be freely recognized in the absence of compelling reasons for its disregard, yet whenever conditions are shown to be such, by reason of the mental and moral limitations or delinquency of parents, that to allow the child to continue in their custody would be to endanger its permanent welfare, this right of the parent must give way, its preservation being of less importance than the health, safety, morals, and general welfare of the child.''

There are also many cases which, in upholding a finding of unfitness, have emphasized that the best interests of the child must be considered in connection with the question of the fitness or unfitness of the parent, that the question is primarily one of fact, and that a finding of unfitness cannot be upset except where totally unsupported. (See for example *In re Lew Choy Foon,* 173 Cal. 159 [159 P. 440] ; *Guardianship of Minnicar,* 141 Cal.App.2d 703 [297 P.2d 105] ; *Yates* v. *Yates,* 138 Cal.App.2d 711 [292 P.2d 934] ; *Guardianship of Aviles,* 133 Cal.App.2d 277 [284 P.2d 176] ; *Guardianship of Casad,* 106 Cal.App.2d 134 [234 P.2d 647] ; *In re Coughlin,* 101 Cal. App.2d 727 [226 P.2d 46] ; *Guardianship of Bynum,* 72 Cal. App.2d 120 [164 P.2d 25] ; *In re Bensfield,* 102 Cal.App. 445 [283 P. 112] ; *In re Johnson,* 101 Cal.App. 110 [281 P. 435] ; *Crater* v. *Crater,* 135 Cal. 633 [67 P. 1049].)

There are also a substantial number of cases holding that the finding of unfitness was unsupported. In *Estate of Akers,* 184 Cal. 514 [194 P. 706], the mother of the child had been married at 17 and had left her husband shortly after the birth of the child. She had no permanent home, but moved from place to place working as a cook, washerwoman, waitress, servant, helper in an airplane factory and candy-store operator. She worked under assumed names, stating that she did this because she feared her husband would find her if she used her real name. During a period of four years she visited the child only once. There was evidence that during the period of her married life she was guilty of immoral conduct. A rather suggestive letter written by her to another man while she was still living with her husband

was introduced. She was seen in restaurants at varying hours with a woman of bad reputation and with two men. Three or four men were seen going into her house, but these, she explained, were roomers or boarders in the house. The court stated that (184 Cal. at p. 520) : "mere lack of integrity is not sufficient in itself to justify depriving a parent of the natural right to the custody of the child. . . . [W]e are not satisfied that, standing alone, the competent evidence adduced upon this phase of the case would have impelled the trial court to the conclusion that the mother was not a fit and proper person . . .

". . . In conclusion, it may not be amiss to say, . . . that, even though it was shown that the mother had not, at the time of the hearing, a permanent home of her own and, therefore, might be unable for the time being to keep the child with her personally, nevertheless she should not for that reason alone be deprived of the legal custody of the child and the related right of selecting a fit and proper place where he should be kept and cared for."

Another case in which a finding of unfitness was reversed is *Guardianship of Willis*, 123 Cal.App.2d 446 [266 P.2d 944]. There the mother of the child involved died, leaving that child and nine other children. The court referred to the home as being "in a deplorable and filthy condition." The father placed the new born child with petitioners, with whom he stayed for four years. They nursed the child to health and he was well cared for. The father hired a housekeeper to help him with the other children, and they all lived in the three-bedroom home of the housekeeper, who also had a minor child of her own. There was evidence that the father had driven the children in his automobile while he was intoxicated; that he used vile and abusive language in the presence of the children; that he became intoxicated at home in the presence of the children; that the housekeeper used profane language in the presence of the children. On the other hand, there was evidence that the father was earning $500 a month; that the children were clean and well cared for; that the father did not mistreat the children. The court concluded that the finding the father was unfit was unsupported and stated (p. 450) : "[T]o brand a parent as unfit would almost certainly mean that the parent could never hope to gain either the respect or affection of his child. The finding of unfitness necessarily implied that . . . [the father] was unfit to care for all of his other children, an implication not supported by

the record." (See also *Matter of Galleher,* 2 Cal.App. 364 [84 P. 352] ; *Estate of Wise,* 179 Cal. 423 [177 P. 277] ; *Washburn* v. *Washburn,* 49 Cal.App.2d 581 [122 P.2d 96] ; *Estate of Lindner,* 13 Cal.App. 208 [109 P. 101] ; *Matter of Schwartz,* 171 Cal. 633 [154 P. 304] ; *Guardianship of Mathews,* 169 Cal. 26 [145 P. 503] ; *Matter of Forrester,* 162 Cal. 493 [123 P. 283].)

In *Ashwell* v. *Ashwell,* 135 Cal.App.2d 211 [286 P.2d 983], the controversy was between competing parents. The trial court, after first awarding the children to the mother awarded them to the father, and the mother appealed. The evidence showed that, after the mother had left the father, she went to live with another man, by whom she had another child ; that when the mother had control of the children she frequently left them in the custody of a small child, and the children were frequently ragged and dirty. The mother testified that she was living with the man in her house because of economic necessity, and that she intended to marry him when her divorce became final. There was also evidence that the appellant had been a good mother and took good care of the children. In reversing the finding that the mother was unfit, the appellate court stated (p. 216) : "There is no worthwhile dispute here but that Norma took good care of her children, and if she did that then anyone who has observed the tasks that must be performed by a mother in caring for four tiny children will know that she is the hardworking, and, toward her children, the conscientious woman that her neighbors testified she was. . . . Except for her relations with Cassella, there is nothing in this record to indicate that Norma is a loose woman. There is here no proof that she is amoral. There is proof of error, but along with it goes proof of her acceptance of the consequences and her expressed desire to regularize, within the possible limits, her habitation with Cassella . . . These two people, regardless of their sin, were in all things else responding commendably to the demands of a burdensome situation. It is proper to bear in mind, as these things are being considered, that in determining where custody of children shall lie the courts are not engaged in a disciplinary action to punish parents for their shortcomings as individuals nor to reward the unoffending parent for any wrong suffered by the sins of the other. . . . The prime question is, what is the effect upon the lives of the children and what will be the effect of a modified decree that disturbs their settled life and compels them to make adjustments to a life with strangers.

In view of the tender ages of these children we think that the conduct of the mother as described in the testimony was at the time this change was ordered having no possible bad effect upon them. They were too young.''

These cases are sufficient to show the attitude of the courts towards the problem here involved. The question now presented for consideration is, what does the evidence in the instant case show on the issue of fitness or unfitness of the mother?

As already pointed out, the record shows that appellant was indicted for the murder of her husband, the father of Susan. The entire record of that murder trial was admitted into evidence in this proceeding. The record shows that appellant was acquitted of the murder charge, which means that the jury found the charge was not proved beyond a reasonable doubt. But, as will be pointed out, the record also shows, and appellant admits, some sort of a relationship with the confessed murderer. The trial judge in this proceeding did not purport to reweigh the evidence in the murder case, but he did give some weight to the evidence there produced. At one place in the record he stated (R.T. 708) : ''[O]ne thing I'm certain of at the present time, and that is that I'm not going to pass upon the guilt or innocence of this lady, whether or not she had anything to do with the killing of her husband; that matter was litigated in Oregon; . . . [the jury's] conclusion was that this lady was innocent of that crime, and that's good enough for me, so I'm not going to endeavor to pass upon that subject.'' But, it is equally clear, that the consideration of the evidence in the Oregon trial was properly a matter of major importance to the trial judge. It certainly was of major importance to him in passing on the admissibility of evidence relating to the past conduct of the appellant. After considerable argument the trial judge ruled that he would admit evidence of her conduct over a period of about 10 years prior to the date of the guardianship hearing. In this connection the trial judge stated (R.T. p. 328) : ''I hate to admit it, but this is not the ordinary petition for guardianship. Here we have a mother of a child who was tried for murder and acquitted. Again, she was a witness in another murder case, where the other Defendant, who claimed that she was the instigator of this murder, was found guilty of second degree murder. Well, under the circumstances, it seems to me that everything has to come in. I hate to prolong this trial unnecessarily, but I have to admit everything that is material

to the case, and from what . . . [counsel for the petitioner] stated, I believe it's material."

At the time of the guardianship hearing appellant was 34 years of age. She had had a somewhat complex marital career. In 1941 she married her first husband, Merrick Hersey, while he was in the army. They had a child, Gregory, born in 1943. Appellant separated from Hersey before he left for overseas. During the war period appellant admitted to an association with a man with a criminal record whom she introduced to her neighbors as her cousin. She denied knowing that this man had a criminal record.

In 1945 appellant was working in a restaurant in San Francisco, and claims that, during this period, she was forcibly raped by someone unknown. Appellant then went to Portland, where, in 1946, a child was born as a result of this rape. Admittedly, appellant explained her pregnant condition to her friends in Portland by stating that she had gone to a cocktail party and got drunk, and someone had taken advantage of her. The child was given out for adoption.

In 1946 appellant obtained a divorce from Hersey in California. In 1947 she lived in Los Angeles for a time, and then went to New Orleans. In 1948 she took a job as a laundress on a cruise to South America, and late that year returned to Portland to put Gregory in school.

In 1949 appellant married Michael Brant from whom she separated in January of 1951, and later that year obtained a divorce. Thereafter, appellant met Kermit Smith, and the child involved in these proceedings was conceived. She had relations with Smith on several occasions, once in the apartment where she and Gregory were living. In the late summer of 1951 appellant and Smith had an argument and they separated without Smith knowing that appellant was pregnant. About this time she received a letter from her first husband, Hersey, suggesting a reconciliation. The two started to live together, and took a trip to Miami. Gregory accompanied them. Hersey had in fact remarried, but appellant testified that she thought he was divorced and that she hoped to remarry him.

Late in 1951 they came back to California and went to San Diego, where appellant discovered that she was pregnant as a result of her affair with Smith. Appellant caused Hersey to believe that he was the father of the expected child. When Hersey discovered her condition he became angry and left appellant and returned to his wife in Sacramento, after advis-

ing appellant to go to Placerville, which she did. The child was born there in 1952. Appellant listed Hersey as the father on the birth certificate. During this period Hersey was paying appellant $40 a month for Gregory's support.

After the child was born, appellant informed Smith in Portland, and he took it for granted that he was responsible. He sent appellant some money, and had the birth certificate corrected. In May of 1952 Smith brought appellant and the two children to Portland, and in August he and appellant were married.

In 1954 appellant separated and obtained a divorce from Smith. She purchased a rooming house in Portland which she operated. There she met Lawrence Wolf, the man who subsequently confessed to the murder of Smith. Wolf was married and had a small son. His wife did not live at the rooming house. Wolf served as a general handyman about the apartment in exchange for room and board for himself and his son. Appellant and Wolf became friendly, how friendly is a matter in dispute. Admittedly, appellant cooked meals for Wolf and the two shared some food expense, and exchanged gifts on holidays. Admittedly, appellant. went on drives with Wolf, and admittedly appellant had four or five dates with him. During this period appellant testified that she also had dates with other men. Wolf, at appellant's murder trial, testified to having had intercourse with appellant. This she denied.

In February of 1955 Smith and appellant became reconciled, and the two remarried, and appellant moved out of the apartment house. She continued to see Wolf, however. On April 21, 1955, Smith was killed when a bomb exploded as he was getting into his automobile. Wolf was arrested, and he implicated appellant, and she was arrested. The day appellant was arrested Mrs. Hightower, the respondent, arrived in Portland, and took Susan back to her home in Los Gatos. After appellant was acquitted she made inquiries about getting Susan back, and then Mrs. Hightower filed the present petition in November of 1955.

One witness who had known appellant since childhood deposed that appellant's "general reputation for personal morality in Portland" was "bad." There was some other evidence about appellant drinking. She testified that she only drank "socially," but admittedly wrote a letter to a friend stating "I'm loaded," and signed it "Love from a drunk." A social worker who had known appellant in Placerville testified that,

in her opinion, appellant lacked judgment and was careless, but on the whole was "pretty much of a wholesome home-body."

Appellant had been confirmed in the Episcopal Church and participated in Gregory's confirmation classes. She belonged to the P.T.A., was a cub scout den mother, and donated to several charities. A doctor deposed that appellant had a character defect, but that it was not sufficient to "change her abilities as a parent." An Oregon friend testified, in the Oregon murder trial, that appellant was quite generous.

Appellant testified that after securing the divorce from Smith in 1954, she had intended to make a trip to Africa on borrowed money, but that illness prevented the trip. She was already in debt for the rooming house. At the time of the guardianship hearing she had no money and no job. She testified that she intended to live with her grandmother who had agreed to help her and the children. She testified that it was her plan to get a degree in gemology and then work in Portland as a gemologist.

As far as the record shows, appellant's relations with her two children—Gregory and Susan—were, on the whole, good. However, she took Gregory with her on most of her travels while she was having the various affairs already discussed. Admittedly, she took him to New Orleans in 1948 contrary to the provisions of the divorce decree.

In Portland she was thoughtful towards the children and bought them gifts and gave them parties. The family minister testified that the children regularly attended Sunday School, and that appellant was cooperative in their religious training.

At the Oregon murder trial Wolf testified that appellant loved Susan, and that she had planned with him to kill Smith rather than again divorce him because she was afraid that he would get custody of Susan.

■ This is a fair summary of the evidence. Does it support the finding that appellant is "unfit" to have custody of her child?

It must be remembered that the trial judge saw this witness and, after listening to much testimony, found her unfit. This finding, under the cases already cited, must be upheld if supported by substantial evidence. The record shows that over several years appellant engaged in several extramarital affairs. The trial judge was justified in believing that her moral standards were low. Her past conduct was far below society's moral norm. Certainly, the record shows that she

lacks certain desirable character traits. These things, standing alone, under the decided cases, perhaps would not be sufficient to support the finding. But they do not stand alone. There is the matter of her indictment and trial in Oregon for the murder of her husband, the father of Susan. It is true that an Oregon jury acquitted her of that charge, necessarily holding that the murder charge was not proved beyond a reasonable doubt. The evidence relied upon by the prosecution in that case to connect her with the crime was that of the confessed slayer Wolf, and that of a confessed robber. The jury obviously did not believe that testimony, and it would not seem proper to retry that case in this guardianship proceeding. But that case cannot be entirely disregarded. Appellant admitted to some sort of a relationship with Wolf. The trial judge was entitled to believe from the evidence in the murder case that, although appellant did not participate in planning the murder, she knew of Wolf's plans and took no steps to protect her husband. The trial judge was also entitled to believe that appellant was involved with the murderer, and that this relationship was the inspiration for the murder. Under such circumstances, to place Susan back into the custody of appellant, would be to subject her to most unpleasant possibilities. The child would always have some doubt about the moral responsibility of her mother for the death of her father. This would certainly not be in the best interests of the child. Under these circumstances we think the finding is supported.

The other points raised by appellant do not require discussion.

The decree appointing Mrs. Ellen Hightower the guardian of the person and estate of Susan is affirmed.

Bray, J., and Wood (Fred B.), J., concurred.