JOANNE FARIA *v.* THOMAS G. FARIA ET AL.*

SUPERIOR COURT     JUDICIAL DISTRICT OF     FILE No. 62896
NEW LONDON

Memorandum filed October 26, 1982

*Howard A. Jacobs,* for the plaintiff.

*Waller, Smith & Palmer,* for the plaintiff on the issue of custody.

*Peter C. Dorsey,* for Waller, Smith & Palmer on the disqualification motion.

*Cantin & Jelly,* for the named defendant.

*Brown, Jacobson, Jewett & Laudone,* for the defendant trustee.

*Byrne, Shechtman & Slater,* for the defendant beneficiaries.

*Thomas J. Londregan,* for the minor child.

NOREN, J. This is an action for the dissolution of marriage brought by the wife as plaintiff seeking, as well, custody of the minor child, support for the minor child, alimony, an assignment of the estate of the defendant and an allowance to prosecute. A second

---

* That portion of this decision relating to the division of the parties' real and personal property has been omitted.

count of the complaint sought to set aside a conveyance, a temporary injunction and other equitable relief. As of right, the complaint was amended to seek a permanent injunction. The parties were each represented by counsel, as was the minor child. To recite the long and tortured history of this litigation is inviting, if not compelling; suffice it to say that the trustee[1] of what is called a "constitutional trust" and its beneficiaries[2] were also represented by different counsel. The defendant filed an answer and cross complaint seeking dissolution of the marriage (in effect, admitting the irretrievable breakdown), custody of the minor child and other equitable relief.

Temporary orders were entered and the case was assigned to this court on a motion to modify temporary custody of the minor child. After a lengthy hearing on a motion to disqualify counsel for the plaintiff, during which counsel for the plaintiff was also represented by counsel, the parties stipulated that the hearing would consider the ultimate question of permanent custody of the minor child. Eventually, after other counsel for the plaintiff appeared, it was stipulated that all of the issues between the parties would be considered and determined by the court.

The court heard testimony over a period of more than five months, a total of about thirty court days, comprising perhaps the longest trial of a family matter in the history of this state. The transcript of the trial literally consists of thousands of pages. The recitation of the testimony here is a physical impossibility. Since the parties eventually reached agreement on many of the issues, the task of the court has been made somewhat less onerous.

---

[1] The trustee was named as a defendant in both the original and amended complaints.

[2] The beneficiaries of the trust had, by motion, been allowed to intervene as defendants.

The court has had the benefit of and has carefully and exhaustively examined and weighed the testimony of the plaintiff and of the defendant on both direct and cross-examination; of Albert J. Solnit, an eminent child psychologist, analyst and psychiatrist; of Neal McKeever, a family relations officer of the court; of Albert Bruzzelli, an optometrist; of Mary Albot, an educator; of Cynthia Ludington, a neighbor of the parties; of Florence Nielsen, a housekeeper of the parties; of Linda Levine Brown, a learning consultant; of Gerald Brown, a learning disability specialist; of Stephen Braisted, a psychologist; of Charlotte Brown, a neighbor of the parties; of Bruce Muller, a psychologist; of Diane, Nancy, Gail, and Susan Faria, the daughters of the defendant by a prior marriage; of James Black, a child psychiatrist; of Burton White, an eminent child psychologist; of Josephine and John Kemp, friends of the defendant; of Carolyn LaFleche, the former wife of the defendant; of Valerie Buchardt, the defendant's housekeeper; of Claudia Bond, the child's teacher; of Harold Levinson, a psychologist; and of Daniel Moalli, a neurologist, among other witnesses. The court has reviewed the exhibits, including photographs and tape recordings.

The following facts are found: The parties were legally married at New London, Connecticut, on April 12, 1975. The name of the plaintiff at the time of the marriage was Joanne Neas, she having been born Joanne Grogusky. The parties have resided in the state of Connecticut for more than twelve months. Only one minor child, Thomas Herbert Faria, born October 26, 1976, and lawful issue of this marriage, has been born to the plaintiff wife since the date of the marriage. The marriage of the parties has broken down irretrievably. See General Statutes § 46b-51 (b). The marriage of the parties is hereby dissolved.

The question of the custody of the minor child has been and remains the primary concern of the parties and is of the greatest moment for the court.

In awarding custody of the minor child as well as in entering orders regarding visitation, "the court shall be guided by the best interests of the child, giving consideration to the wishes of the child if he is of sufficient age and capable of forming an intelligent preference, provided in making the initial order the court may take into consideration the causes for dissolution of the marriage . . . ." General Statutes § 46b-56 (b). In this case it is concluded that the minor child, five years old at the time of the hearing, is not of sufficient age or capable of forming an intelligent preference. The court, with the knowledge and consent of the parties and their counsel and of counsel for the minor child, did meet, however, with the minor child at the home of the defendant and at the home of the plaintiff, and also in what might be termed neutral territory. In any event, the minor child did not express a preference for his custody to be awarded to either party.

The best interest standard is described by the plaintiff in her brief as being "deceptively simple." Our Supreme Court has described the decision of the court in awarding custody to be an "awesome responsibility" and has gone on to say that the task is to "find the most salutary custodial arrangement for the children . . . [taking into account] the parents' past behavior, since [the court] must evaluate their present and future parenting ability and the consistency of their parenting for the purpose of determining which parent will better foster the children's growth, development and well-being." *Yontef* v. *Yontef,* 185 Conn. 275, 283, 440 A.2d 899 (1981). Yet, it is the duty of the court to determine "not which parent was the better custodian in the past but which is the better custodian now." *Yontef* v. *Yontef,* supra, 283. Neither mother nor father is preferred as custodian of a minor child; *Simons* v. *Simons,* 172 Conn. 341, 374 A.2d 1040 (1977); and the decision as to who will be awarded custody requires a "flexible, individualized adjudication of the particular facts of each case without the con-

straint of objective guidelines." *Seymour* v. *Seymour,* 180 Conn. 705, 710, 433 A.2d 1005 (1980). As this case admirably demonstrates, the court is and must be free to rely on whatever parts of an expert's opinion that it finds to be probative and useful, or on the testimony of one expert over another. *Yontef* v. *Yontef,* supra; *Johnson* v. *Healy,* 183 Conn. 514, 515–17, 440 A.2d 765 (1981).

It is found that each of the parties is a fit and proper custodian of the minor child, each having a loving, caring relationship with the child, and each being deeply interested in and concerned with his physical, mental, emotional, educational and moral needs and development. Each parent is, in the language of the literature, the psychological parent of the minor child. See *Seymour* v. *Seymour,* supra.

Since April 13, 1981, the parties have jointly shared the custodial care of the minor child, who has been alternating his residence on a weekly basis at the homes of each of his parents; during the week that he is at one home, the other parent has daily visitation from 3 p.m. until 6 p.m. Since this arrangement has been in effect for over a year, the first issue is whether the temporary custody order should be made permanent. At first glance this case has all of the earmarks to favor a joint custody arrangement. The parties live in close proximity on the same street, being separated by a house lot and a public boat launching right of way. The houses are within easy walking distance of each other and the neighborhood is quiet with minimal traffic. Both parties reside in large homes in which to accommodate the minor child and there are sufficient assets to afford the double expenses of maintaining two separate living quarters for the minor child.

For joint custody to work for the benefit of the minor child, however, there must be a willingness of both parties to work together. Both parents must be able to communicate with each other and cooperate with each

other in the development and the raising of their child. This willingness to cooperate and the communication needed is not present between the parties. Each parent has testified that sole custody is desired. There appears to be little communication between them except when physically necessary to move the minor child each day pursuant to the court order. There is little cooperation between them in changing the schedule to meet his needs or their own needs. The parties disagree on the medical care which presently should be given to the minor child, as well as on his educational needs. The defendant claims that the plaintiff is not attentive to the minor child's educational needs, while the plaintiff claims that the defendant is overzealous in pursuing the minor child's educational development. The present joint custody arrangement is not working for the minor child. It is a rigid schedule that has become inflexible as a result of the demands of each party. Albert Solnit, a child psychologist and psychiatrist, has expressed the opinion that it is hard for the minor child to switch homes and that such a schedule would be difficult even for an adult to maintain on a daily basis. Cynthia Ludington has testified that the minor child and her son are unhappy when it is time to stop playing in order to comply with the court orders. The plaintiff has indicated that it interferes with weekend trips or activities, vacation plans and special days. Special days seem to be repeated in the minor child's life, as each parent insists upon spending such times with him. Perhaps of even greater significance is the testimony of Solnit that the current arrangement interferes with the minor child's being able to gain confidence in that he tries too hard to please adults. Solnit is uncertain as to which parent should have custody of the child. He concludes that it is important for the minor child to have the sustaining care of one parent. Claudia Bond, the teacher who has been with the minor child every school day for the last eight months, has observed that he never refers to *his* home. He refers to his daddy's

home and his mommy's home. The best interests of the minor child in the view of the court would be served by terminating the present joint custody arrangement and awarding his care and custody to one parent. This case, therefore, also demonstrates the lack of wisdom in mandating a preference for joint custody in family matters.

The parties have demonstrated by a number of witnesses that each is a good parent, capable of meeting the minor child's needs and that each has a special bond and relationship with the minor child. Both claim to be the principal figure in his life.

On behalf of the defendant, all of his children from a prior marriage testified to a loving relationship that they have experienced with him and that they have observed in his relationship with the minor child of this marriage. Charlotte Brown and her husband, neighbors of the parties, have observed the defendant playing outside with the minor child on a regular basis. Valerie Buchardt, the defendant's housekeeper for the past five months, has observed a very good and happy relationship between father and son. Carolyn LaFleche, the defendant's former wife, testified as to his capabilities as a parent and his supportive role with all of his children. John and Josephine Kemp from New Jersey, neighbors of the defendant and minor child while they resided there, testified as to the involvement and interaction that they observed between them.

Similarly, on behalf of the plaintiff, Cynthia Ludington, a neighbor whose son plays with the minor child, has observed the plaintiff to be a good mother, having a very good relationship with the minor child. Arlene Hill, the defendant's former housekeeper, personally observed the daily activities in the Faria household beginning when the minor child was three months of age until he was ten months of age, and she testified that the plaintiff gave "quality time" to him. She observed the plaintiff talking, singing and playing

with the minor child. She also observed the plaintiff changing the diapers and dressing the minor child. While at work, the plaintiff called home every day. Hill received her instructions from the plaintiff and the plaintiff was the primary caretaker during the minor child's early years. Florence Nielsen also personally observed the Faria household when the minor child was a baby and observed the plaintiff to be very interested in him, aware of everything that was happening around him. The inference from her testimony was also that the plaintiff was the primary caretaker during the minor child's early years. The defendant's schedule was to come downstairs at about 9:30 a.m. and to leave for work between 10:30 and 11 a.m. After coming home for dinner he returned to the factory on a regular basis.

Each party has made many accusations against the other. They range from the inability properly to dress and clothe the minor child to being neglectful in the areas of medical and educational needs. The defendant has claimed that the plaintiff is unable or unwilling to recognize the minor child's problems, both medical and educational. He further claims that she is a closet alcoholic and did not provide a normal lifestyle for the family during the early years. He further claims that she goes into rages, screaming at family members, and uses obscenities. He further claims that she has been neglectful in that she has put her career and work ahead of the needs of her child by going back to outside work and to school. He claims that she has placed these as priorities over her son. According to the defendant, the plaintiff had threatened to take the minor child away and that he would never see the child again.

The plaintiff claims that the defendant is obsessed and preoccupied with the minor child's education and medical needs. She fears that he is putting too much pressure on the minor child to be overly bright by constantly drilling the minor child and providing him with inappropriate toys and materials for his age. The plaintiff feels that there has been too much testing of the

minor child and that the defendant expects too much of him. Once, when the child failed to live up to the defendant's standards, he referred to his son as stupid. She claims that the defendant has indicated to her that she will have no input in matters concerning the minor child and has degraded her in front of her son by calling her names. There is no need to comment on each and every allegation. Some of these claims, however, should be discussed.

The plaintiff was very candid in her testimony about her drinking. She indicated that she handled her first divorce badly and that when depressed and upset she did in fact drink. On at least one occasion she did drink to excess, consuming a fifth of Scotch whiskey. After reviewing all of the evidence and hearing all of the testimony, it cannot be found that the plaintiff is under the influence of alcohol on a regular or daily basis, nor can it be found that consumption of alcohol by the plaintiff now interferes with and affects her ability to care for the daily needs of the minor child. There is no evidence to support a finding that the minor child would be "at risk" or in danger for his physical or emotional welfare on this ground if placed in the care and custody of the plaintiff. Solnit came to this conclusion as well. Neil McKeever, the family relations officer whose report is on record, thoroughly investigated this claim and also concluded that there is no evidence of a drinking problem with the plaintiff.

There is evidence that the plaintiff went into rages, screaming accusations and using obscenities. This conduct usually involved arguments principally between the defendant and the plaintiff and between the plaintiff and her children from a prior marriage. The arguments with the defendant were about the plaintiff's position at the factory, her business relationship and bonuses or money that was to be paid to her. The screaming, the rages and the obscenities were not directed at the minor child but sometimes occurred in his presence. The arguments between the parties were

not about the medical problems of the minor child, nor were they about his education. These arguments must be evaluated in light of the fact that the parties' marriage was failing. There was a great deal of pressure when the parties realized that their marriage was not succeeding. Arlene Hill testified that when she was in the house she heard both parties use obscenities during such arguments. From all of the evidence and a review of all of the testimony, it cannot be found that the plaintiff now uses obscenities on a regular basis. It cannot be found that the minor child is subject to continued screaming and rages now that the parties have separated. It appears that the "war zone" as described in the testimony of the defendant no longer exists.

The defendant argues that the plaintiff has placed her work and career above the needs of the minor child. He points to the fact that the plaintiff went back to work part-time shortly after the minor child was born and within three months commenced work on a full-time basis. He further states that the plaintiff stopped breast feeding the minor child as it was interfering with her job. The defendant, however, either consented or did not object to the return of the plaintiff to work. It appears that the decision was a joint one and it was what both parties wanted at the time. The plaintiff did pursue her education one night a week in New Haven and took courses in Boston. The testimony is clear that adequate care for the minor child was prearranged during these periods. There was no objection by the defendant to the taking of these courses. In fact, it appears that he consented and supported her in this endeavor. The plaintiff adequately explained the medical problem that she was experiencing in breast feeding her child as the reason she stopped.

The defendant has consistently claimed that the plaintiff is not attentive to the minor child's educational needs and that, if the minor child is to succeed, the defendant is the parent who would provide the

necessary educational care. His testimony and the testimony of his experts is that the minor child's education is at risk because he does not have an individualized educational program. There is no evidence to support the contention that the minor child was legally required to have had an individualized program this past school year. The defendant did not request one from either the plaintiff or the minor child's school. He consented to the placement of the minor child at the school. None of the defendant's experts has prepared an individual educational program. Actually, Burton White, Bruce Miller and James Black, psychologists, and Gerald Brown, a learning disability specialist, testified that they could not formulate an individual educational program. The minor child may well need such a program but it cannot be found from the evidence that the plaintiff has been deficient as a parent in not having one prepared.

It appears that the minor child's medical needs at the present time are being met. He is under the care of a physician for his ear infections. He is also under the care of a physician for his eyes and attends speech and eye therapy sessions during the week. One area of disagreement between the parties is whether the minor child has dyslexia. They disagree as to the course of treatment prescribed by Harold Levinson, a psychologist. The defendant believes that the minor child is dyslexic, while the plaintiff has her doubts. There is a substantial amount of current research in this area of medicine. Albert Bruzzelli, an optometrist and the defendant's witness, gave two definitions. Under the "true" definition, the minor child does not have dyslexia; under a "broader" definition, the minor child does have dyslexia. This is not an area of medicine with majority and minority views. In the United States, although not in the medical world, Harold Levinson stands alone. His medical opinion on dyslexia and its treatment with motion sickness medication has not been accepted by other physicians in the United States.

It cannot be found that the plaintiff has been neglectful as a parent or lax and uncaring for not consenting to treating the minor child with motion sickness medication for his "dyslexia." Nor can the defendant be faulted for his interest in seeking new means of treating the problems of the minor child.

The most distressing aspect of this case is the removal of the minor child from the state for a period of over seven months, during which time the defendant changed his name and that of his son, and during which time the plaintiff had no contact with or knowledge of the whereabouts of the minor child. Granted, the defendant took the extreme action prior to there being any order of any court regarding custody of the minor child, and in the face of the threats by the plaintiff to take the child to prevent the defendant from seeing him. This activity took place in the context of what the defendant described as the "war zone"; the distasteful, nay shocking, situation in the home caused by the bickering, fighting and arguing of the parties.

Even accepting the situation as fact, and there is evidence of the same before the court, the action of the defendant cannot be condoned, although the situation here is different from and perhaps less extreme than that in *Hall* v. *Hall*, 186 Conn. 118, 439 A.2d 447 (1982), or in *Nehra* v. *Uhlar*, 43 N.Y.2d 242, 372 N.E.2d 447 (1977), where the plaintiff had secreted the child in defiance of a court order. The abduction of children by parents to avoid custody decisions by the courts must be deterred. Indeed, the Uniform Child Custody Jurisdiction Act has been enacted in this jurisdiction with that purpose in mind. See General Statutes §§ 46b-90 through 46b-114. Yet, the highest court of the state of New York recognized "that the apparent imperative to discourage abduction must, when necessary, be submerged to the paramount concern in all custody matters: the best interest of the child. Other-

wise '[t]he dignity of the several courts would be preserved, but the welfare of the children would be destroyed . . . .' " *Nehra* v. *Uhlar,* supra, 250.

" 'In deciding where custody of children shall lie, the courts are not engaged in a disciplinary proceeding to punish parents for their weaknesses as individuals nor to reward the unoffending parent for any wrongs suffered for the sins of the other. *Ashwell* v. *Ashwell,* 135 Cal. App. 2d 211, 286 P. 2d 983 [1955]. . . . Prior misconduct must have a direct bearing on the issue of present fitness and may be considered in connection with it.' *Santens* v. *Santens,* 180 Cal. App. 2d 809, 818-19, 4 Cal. Rptr. 635 [1960]." *Bialac* v. *Bialac,* 240 Cal. App. 2d 940, 947, 50 Cal. Rptr. 12 (1966). See *Mathewson* v. *Mathewson,* 207 Cal. App. 2d 532, 24 Cal. Rptr. 466 (1962); *Allen* v. *Allen,* 156 Cal. App. 2d 499, 319 P.2d 673 (1957).

The court has previously made findings regarding the capacity of each of the parties to be custodian, taking into account all of the evidence, including the removal of the child by the defendant. Whatever may have been the effect on the minor child during his absence from Connecticut or shortly after his return, and the evidence is directly in conflict, the minor child seems to be happy and well adjusted now despite his difficulties.

Also, it was during the period when the minor child was secreted from his mother that his undisputed developmental lags were discovered. Various physical problems had been observed in the minor child prior to that time, such as an eye turn. Yet, it was only during this period that the magnitude of the minor child's developmental "deficits" or problems were discovered and began to be addressed. Those were addressed by the defendant.

While the plaintiff has attempted to present to the court a picture of the defendant as stubborn, opinionated and overly anxious about his son, it is evident

that the defendant is more willing than the plaintiff to consider new explorations and treatment for the problems of the minor child and that he has always, before, during and after the removal from this jurisdiction, evidenced more interest than the plaintiff in educating himself about the problems of the minor child, in obtaining expert evaluation and diagnosis of the same, and in attempting to have them corrected or treated.[3]

It is unnecessary for the court to find whether the minor child is dyslexic or merely learning disabled. The experts are unable to make or agree upon such a determination—and the court will not tread there—despite what must be the most exhaustive evaluation of any child the subject of a custody dispute.

It is necessary for the court to award custody of the minor child to one of the parents. The problems of the minor child are undisputed and real; only their magnitude is disputed. The court is convinced that it is the defendant who is more willing and able to address those problems and to take the appropriate steps to have them treated and, hopefully, corrected.

Custody of the minor child is, therefore, awarded to the defendant.

Although the recommendation of appointed counsel for the minor child regarding custody has not been completely followed in this case, the court would indeed be remiss if it did not comment upon the dedication and competence with which the minor child was represented. Not only was counsel for the minor child diligent in his attendance upon the court, but he had

---

[3] Ironically, too, it was during the period when the defendant and the minor child were absent from this state that the defendant demonstrated his capabilities as a "single parent," providing for the minor child more than adequate, and entirely appropriate, food, clothing, housing, toys, education and medical treatment, and, not incidentally, indicating his willingness and ability to subserve his life and career to the needs of the minor child.

numerous conferences with his client, witnesses and other counsel. His brief is cogent and scholarly, so much so that some of its contents are incorporated into this decision.[4]

The plaintiff proposed a reasonable visitation schedule for the defendant if she were awarded custody which, with minor modification, is ordered for her. Visitation, which shall be liberally construed, as a minimum, is awarded to the plaintiff as follows:

(1) Two weekends each month (weekends defined as starting at 9 a.m. Saturday morning and ending Sunday at 7 p.m.).

(2) Each Wednesday from 3 p.m. to 7 p.m. during the school year. During the summer school recess, the Wednesday visitation will be from 9 a.m. to 8 p.m.

(3) Christmas, Easter and Thanksgiving from 3 p.m. to 8 p.m.

(4) The minor child will spend Father's Day with the defendant and Mother's Day with the plaintiff.

(5) The minor child will spend the defendant's birthday with the defendant and the plaintiff's birthday with the plaintiff (subject to the requirements of the minor child's school schedule).

(6) The minor child will spend the minor child's birthday with the plaintiff from 3 p.m. to 7 p.m. (subject to the requirements of the minor child's school schedule).

(7) Commencing with the summer of 1983, the plaintiff will have the minor child for two weeks, during which time other rights of visitation will be suspended.

---

[4] Nor has the recommendation of the family relations officer on the question of who should have sole custody been followed. See *Yontef* v. *Yontef,* 185 Conn. 275, 440 A.2d 899 (1981); *Johnson* v. *Healy,* 183 Conn. 514, 440 A.2d 765 (1981). The testimony and report of that officer was of great value to the court.

The defendant, in light of past differences between the parties, is ordered to advise the plaintiff of all medical, psychological and psychiatric consultations, evaluations and treatments proposed to be performed for or on the minor child and the names of those who perform or are to perform the same, and the defendant is ordered to provide the plaintiff with all reports of the same received by him.

In order to foster the best interests of the minor child, the defendant is also most strongly urged to consult with the plaintiff regarding all medical, psychological, and psychiatric consultations, evaluations, and treatments for the minor child.

The defendant is also ordered to advise the plaintiff of all educational programs proposed for the minor child and to provide the plaintiff with the names and locations of proposed schools, as well as copies of all educational or scholastic reports received by him. The hortatory comment made above is repeated regarding the education of the minor child.

\* \* \*

Both the plaintiff and the minor child, through briefs filed by their respective counsel, have recommended to the court that the automatic stay for appeal provided by Practice Book § 3065 be terminated in this case. See *Yontef* v. *Yontef,* 185 Conn. 275, 290–92, 440 A.2d 899 (1981). While the defendant has not been heard regarding this matter, it would appear, in light of the decision regarding custody above and in light of the agreement regarding financial matters, that he will have no ground for objection.

In *Yontef,* our Supreme Court recognized that the post judgment period, when pendente lite orders have been terminated, and the automatic twenty-day stay of the judgment is in effect, represents a time of potential instability that may result in actions not in the best interests of the child. "A trial court rendering a judgment in a disputed custody case should therefore con-

sider entering protective orders sua sponte to ensure an orderly transition that protects the primary interests of the children in a continuous, stable custodial placement. It is true that the parties themselves may present postjudgment motions to continue or to shift custody, while an appeal is pending, but time is required for such motions to be calendared and heard. In the meantime, when anxieties and disappointments are likely to be great, the temptation for disruptive self-help is large. We have previously recognized that the emotionally laden circumstances that surround marital dissolutions impose a special burden on trial courts to conduct a searching inquiry into the acceptability of a divorce settlement. *Monroe* v. *Monroe,* 177 Conn. 173, 184, 413 A.2d 819 (1979). We now extend that burden to encompass as well a searching inquiry into the best interests of the minor children during the immediate postjudgment period." *Yontef* v. *Yontef,* supra, 291–92.

Justice Peters suggested that the trial court should inquire as to whether its custody orders will be the subject of an appeal. If it appears that an appeal is likely, the court should enter whatever postjudgment orders it deems necessary. "A court exercising its equitable jurisdiction with regard to custody has the duty to assure itself that its judgment will be implemented equitably to serve the best interests of the children for the near as well as for the more distant future." *Yontef* v. *Yontef,* supra, 294.

Because of the inability of the parties to agree upon what is in the best interests of the minor child in the past and because of their implacable attitudes toward each other, the affirmative duty imposed upon the court in *Yontef* in all custody cases seems especially appropriate here, in light of the plaintiff's threats in the past to remove the minor child from the jurisdiction and the defendant's actions in so doing.

It would appear to be more than idle speculation that this decision will be appealed. Indeed, the likelihood appeared certain from the beginning without regard to the content of the decision; the course of the case since then has done nothing to change that.

The automatic stay for appeal provided by Practice Book § 3065 ought to be and is hereby terminated. Visitation with the minor child exercised by the plaintiff during the appeal period and pending the outcome of any appeal filed will be exercised only within the confines of the state of Connecticut, unless otherwise specifically authorized by this court. During the appeal period and pending the outcome of any appeal filed, the defendant will not remove the minor child from the state of Connecticut unless specifically authorized by this court.

Judgment will enter accordingly.