[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION RE: MODIFICATION OF CUSTODY AND VISITATION 
CT Page 16139
Defendant Christine Taylor seeks a modification of the joint custody order that was entered at the time the parties' marriage was dissolved. Taylor now wants sole legal custody of Joshua Evans, whom she and plaintiff Marc Evans adopted during their marriage. Evans opposes the motion for sole custody and seeks to expand his visitation rights. For the reasons stated below, the court finds that joint legal custody was not in the best interests of the child at the time of the dissolution of the marriage and further finds that joint legal custody is not presently in the best interests of the child. Accordingly, the mother is granted sole legal custody. The father's visitation rights are expanded.
 I
The court will first address the custody issue. During the parties' marriage, they adopted Joshua Evans, who was born on July 29, 1994. The adoptive parents were divorced in November of 1997 after a trial wherein they contested only financial issues. Before the trial, the parties entered into a custody and visitation agreement, which they submitted to the court, Driscoll, J. The agreement provides that the parents are to have joint legal custody of Joshua Evans and Defendant Christine Taylor is to have physical custody. The court adopted the agreement and incorporated it into the judgment.
This court's authority to modify custody orders is set forth in General Statutes § 46b-56. "[Our Supreme Court] has limited the broad discretion given the trial court to modify custody orders under General Statutes § 46b-56 by requiring that modification of a custody award be based upon either a material change of circumstances which alters the court's finding of the best interests of the child . . . or a finding that the custody order sought to be modified was not based upon the best interests of the child . . . ." (Citations omitted.) Hall v. Hall,186 Conn. 118, 129 439 A.2d 447 (1982). Walshon v. Walshon,42 Conn. App. 651, 657, 681 A.2d 376 (1996). "It is not uncommon for the parties in a dissolution of marriage to focus their attention primarily on the termination of the marriage relationship. Unfortunately, under this pressure some custody awards may be made which are not in the best CT Page 16140 interests of the child. This court has always held that the paramount consideration in custody matters is the welfare of the child." Simons v.Simons, 172 Conn. 341, 347, 374 A.2d 1040 (1977). This court's primary focus must be on the best interests of the child, i.e. "the child's interest in sustained growth. development, well-being, and in the continuity and stability of its environment." Cappetta v. Cappetta,196 Conn. 10, 16, 490 A.2d 996 (1985).
This court has heard testimony from a psychologist, two social workers, the parties, and two lay witnesses. After considering all the evidence, this court finds that the observations of the three professional witnesses should be given considerable weight.
Between April 14, 1999 and November 11, 1999, Harry Adamakos, a licensed clinical psychologist who specializes in the treatment of children and families, met with and administered psychological tests on Ms. Taylor, Mr. Evans, and Joshua Evans. Dr. Adamakos has a doctorate in psychology. He noted that Joshua was caught in the middle of his parents' conflict and was in a high level of anxiety. At the end of his thirty-one page report (Defendant's Exhibit 2), Dr. Adamakos states the following:
 This evaluation clearly underscored a conclusion that Mr. Evans and Ms. Taylor continue to engage in a power struggle that puts their son square in the middle. Both parents appear to remain extremely angry at each other, and each exudes their hostility in a manner that leads this examiner to believe that Joshua must be exposed to a high level of vitriol on a fairly regular basis. Each parent seems compelled to blame the other's past and present behaviors as the cause of the current problems. That each parent tends to be so focused on the other parent drastically diminishes their ability to focus on what it is that they can do differently. Importantly, their ongoing post-dissolution battle clearly reduces their ability to focus on their son's needs.
 It is problematic enough that Joshua must exist in two distinct psychological worlds — one with father and one with mother. Indeed, in his experience, when these two worlds overlap with each other, it is oftentimes accompanied by acrimony and perceived violence. It is extremely troublesome that he is exposed to the ongoing anger and hostility in a fairly regular way even when he is . . . physically with only one of his parents. It is forcefully recommended that CT Page 16141 the parents cease and desist from such behavior. Both Mr. Evans and Ms. Taylor demonstrate enough psychological upset and disturbance around these issues, that both should strongly consider their own individual psychotherapy, especially if they cannot stop directly exposing Joshua to their anger. Joshua's awareness of his parents' hostilities was striking in how salient and vivid it is. This awareness directly contributes to his own insecurity and feelings that his world is an unsafe place.
 Joshua is a young boy who appears to be at extremely high risk for ongoing psychological difficulties. While it is a certainty that his parents' ongoing acrimony contributes greatly to his problems, there was also considerable evidence to suggest some biological disposition for developmentally related problems. At this juncture, rather than blame forces in Joshua's environment as the cause of his problems, it would seem more prudent to focus on interventions and recommendations that might maximize Joshua's chances to improve his psychological functioning. . . .
 . . . [T]he present circumstances are far from satisfactory, as Mr. Evans and Ms. Taylor have close to zero capacity to parent together in any meaningful fashion. This is not likely to change sufficiently in . . . [the next] . . . few years, years critical to Joshua's development.
 Based upon this psychological evaluation and the conclusions and recommendations tendered so far, it is respectfully recommended that the court consider granting sole legal custody and primary physical custody to Ms. Taylor. It is quite clear that a joint custody is not in Joshua's best interest, and the results of this evaluation would strongly support the notion that his interests are better served with his mother as primary legal and physical custodian. While Ms. Taylor is struggling to meet Joshua's needs, it appears as though she has attempted to do so in the best way she can. Importantly, she utilizes external supports such as psychotherapists whenever appropriate, and there is a sense that she will be able to improve her parenting skills with continued involvement in such work.
CT Page 16142
 Joshua clearly cares for his father, although their relationship appears to have suffered over the past couple years. It is very important that father and son have meaningful time with each other. . . .[I]t is recommended that transfers continue to occur at the police station, except when they can occur at school (i.e. Monday morning).
 Joshua continues to need ongoing psychotherapy. . . .Since there are no natural lines of communication, Joshua's therapist can be in a position to provide some level of collaboration, at least as it pertains to his behavior and psychological experience. The lack of communication between the parents makes this recommendation imperative. . . .
A family relations counselor employed by the Court Support Services Division of the Superior Court, Ms. Leah Martin Fucci, met on three occasions with each parent. She contacted doctors, counselors, and others who are familiar with the plaintiff, defendant, and Joshua. Ms. Fucci has a B.A. in social work and a masters in counseling. She found that the parents are unable to communicate, that is, they do not have the ability to freely, openly and objectively discuss issues relating to the child's welfare. She also found that Ms. Taylor is able to care for Joshua and make appropriate decisions with respect to the child's health and welfare. In her evaluation report, which is Defendant's Exhibit I, Ms. Fucci relates incidents that plaintiff and defendant repeatedly referred to in their own testimony before this court. Ms. Fucci's conclusions and recommendations are as follows:
 [B]oth placed blame on the other for any problems related to their son. Marc Evans asserts any difficulty in the parents' communications or with regard to Joshua can be traced back to the mother being psychotic and dangerous. Christine Taylor claims Mr. Evans will not speak with her directly. Neither parent took responsibility for the current hostile situation between them. This counselor has assessed that both the mother and father have become so consumed with "finger pointing', they have lost sight of how their own behaviors impact Joshua and what truly is in the best interest of their son. . . .
 Until the parents can put aside their personal grievances and learn to work cooperatively for the CT Page 16143 benefit of Joshua, it makes sense for legal custody to rest with one parent. Since the parents' separation, Ms. Taylor has been Joshua's primary caretaker. Further. the mother has been quite active in the child's therapy in order to meet her son's emotional needs. . . .
 It is recommended that Christine Taylor have sole custody of Joshua Evans. . . ."
From September of 1998 to May 26 2000 Jeanne O'Donnell, a licensed clinical social worker employed by the Child Guidance Center in Bridgeport, treated Joshua in a therapeutic setting. Ms. O'Donnell has assisted a thousand or more children and families over the past twenty-five years. Ms. O'Donnell met with the mother and father and received "tons of phone calls from each parent." She described the parents conflict as being "like a war zone from the beginning." Ms. O'Donnell found Josh to be an impulsive child who was difficult to manage and in need of a lot of structure and intervention. She opined that the child's behavior may in part be affected by a genetic or biological disorder due to a lack of prenatal care. The adoptive mother, Christine Taylor, understood the need for parental-interventions as recommended by Ms. O'Donnell. The adoptive father, at times, agreed with Ms. O'Donnell's recommendations and, at other times, focused on his belief that his son's behavior problems were caused by the mother. Ms. O'Donnell noted that the mother exhibited "lots of anger" toward the father and that the father expressed "incredible rage" toward the mother. On the positive side, O'Donnell found that Josh wanted to have a relationship with his father. The child never expressed fear of his father nor fear of being away from his mother.
The parents are intelligent, educated persons. Christine Taylor is a graduate of the University of Michigan and possesses a graduate degree in English and business. Marc Evans has a degree in education. Each testified about incidents that he or she asserts show the other's lack of parenting skills and communication abilities. Both related their recollection of an occasion when the police were called to mediate a dispute that arose after the mother dropped off the child at a CVS Pharmacy for a visitation with the father. Presently, the drop-off and pick-up point for visitations is in the lobby of the Fairfield police station. Each parent accused the other of causing the child to suffer minor injuries. The father obtained a restraining order against the mother. The mother obtained two restraining orders against the father. The father related how he was arrested twice as a result of the mother's accusations and expressed a hope that the mother will some day be arrested. In telling their versions of the episodes, each exuded anger, CT Page 16144 distrust, and disdain for the other.
The parties' ability to communicate, while poor at the time of the divorce, has deteriorated over the past few years. Presently, they cannot even discuss without the assistance of others the physical movement of the child to visitations with the father. They cannot agree on whether Josh needs therapy. Marc Evans acknowledges that his relationship with his ex-wife is not very good. He states that Ms. Taylor has threatened him with arrest at the beginning and end of his visitations with Josh: "You are going to jail, and I am going to make sure you go there." Mr. Evans believes that his ex-wife is an emotionally unstable woman and that she physically and emotionally batters Josh. The father does not trust the mother's judgment; he does not believe she can be trusted with critical decisions. He does not want to meet alone with Ms. Taylor. He suggests that they communicate by E-Mail, letters, the voice-message system on his cellular phone, or by meeting in the presence of a third person. Clearly, the parties do not have the ability to discuss important child-rearing issues.
In making a custody determination, this court must consider the child's present best interests. The parents' past behavior is, of course, relevant to evaluating their present and future parenting ability. Blake v.Blake, 207 Conn. 217, 224, 541 A.2d 1201 (1988). "For joint custody to work for the benefit of the minor child, . . . there must be a willingness of both parties to work together. Both parents must be able to communicate with each other and cooperate with each other in the development and the raising of their child. This willingness to cooperate and the communication needed is not present between the parties." Fariav. Faria, 38 Conn. Sup. 37, 41 (1982). What was true in the just quoted case is true here. There is no communication. Joint legal custody was never in the best interests of Joshua Evans and is not now. This court finds that the best interests of Joshua Evans will be furthered by granting the mother sole legal custody. Accordingly, defendant Christine Taylor's motion for sole legal custody is granted.
 II
The court will now address visitation. "When a court rules on a motion to modify visitation, it is statutorily incumbent on the court that its order be guided by the best interest of the child standard, as set forth in General Statutes § 46b-56." Szcerkowski v. Karmelowicz,60 Conn. App. 429, 432 ___ A.2d ___ (2000). Mr. Evans wants to strengthen his relationship with his son. "He is a boy and needs his father," Mr. Evans testified. "He needs to know that I have not abandoned him, and that I love him." All agree that the father-son relationship should be nurtured. CT Page 16145
This December. the father desires to take his son on a cruise with the father's parents and the child's aunt, uncle and cousins. When Dr. Adamakos was asked about this proposal, he pointed out that there has not been a track record with the father and son being together for an extended period of time. Ms. O'Donnell expressed concern about the infrequency of visits between the father and son and indicated that such a trip would be "a big leap in a short period of time." Ms. Fucci indicated that an eight or nine day cruise would probably not be in Joshua's best interests. Joshua is a child who is subject to tantrums. Limits have to be carefully and skillfully placed on the child's conduct. Such a trip at this time does not appear to be in the child's best interests.
The child shall reside with the defendant mother. Parenting and visitation orders are entered as follows:
 1. The child shall visit the plaintiff father on alternate weekends from Sunday at 10:00 a.m. to Tuesday morning when he the shall drop the child off at school or, if summertime, at day camp.
 2. In July and August, there shall be one weekend each month when the child's visitation with the father shall begin on Thursday at 5:00 p.m. instead of Sunday, and shall end on Monday morning, instead of Tuesday morning. The father shall pick up the child at day ramp and return the child to day camp.
 3. The child shall be with the mother on Christmas Eve and Christmas Day each year and, commencing in year 2001. the child shall visit with the father December 26, 27, 28, and 29. The child shall visit with the father on the two Passover Seders. The child shall be with the mother on Easter Sunday. If this order should conflict with visitation order number one above, this order is to have priority and is to be followed.
 4. The child will be with the mother on Mother's Day and with the father on Father's Day from 10:00 a.m. to 6:00 p.m. If this order should conflict with visitation order number one above, this order is to have priority and is to be followed.
 5. In 2001. the child shall visit with the father on Thanksgiving weekend from Wednesday afternoon through CT Page 16146 Sunday. Thereafter, the parents shall alternate Thanksgiving weekends, i.e. the child shall be with the father in the odd numbered years from Wednesday afternoon through Sunday. If this order should conflict with visitation order number one above, this order is to have priority and is to be followed.
 6. The father, at least one week prior to an overnight visitation, shall provide the mother with the address and telephone number where the child will be for the overnight visitation.
 7. The mother. should she intend to change her and the child's residence, shall notify the father ninety days prior to such change.
 8. The mother shall keep the father informed of any major health or educational issues involving the child and shall provide him with the names, addresses and telephone numbers of the child's doctors and therapists.
 9. The mother shall mail to the father copies of information that she receives from the child's school with respect to the child's teachers, schedule, grades and activities.
10. If the child resumes therapy, the parents shall cooperate with the therapist.
 11. On those occasions when the father does not pick-up and drop-off the child at school or day camp, the pick-up and drop-off for visitations shall be in the lobby of the Fairfield Police Station.
 III
In summary, the plaintiff mother is given sole legal custody of Joshua. Parenting and visitation orders are entered in accordance with the foregoing.
THIM, J.